GRUPE DRIER & BOILER CO. v. GEIGER, FISKE & KOOP.

(Circuit Court of Appeals, Eighth Circuit. April 10, 1914.)

No. 3959.

1. PATENTS (§ 234*)—INFRINGEMENT—JOINING TWO PARTS OF MACHINE INTO ONE.

Infringement is not avoided by the joinder of two parts of a patented machine into one if the new one performs the same functions in substantially the same way; but it is otherwise if the patentee has intentionally made their separability an essential feature of his invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 370, 381; Dec. Dig. § 234.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—DRIER.

The Chamberlain patent, No. 822,185, for a drier, used chiefly for drying spent grains in breweries and distilleries for feed, is void for prior use by others of a conveyor in the bottom of the draft flue for carrying the deposit of wet chaff therein back into the drying cylinder, which is the essential feature of the patented machine.

3. PATENTS (§ 81*)—PRIOR USE—EVIDENCE TO ESTABLISH.

The rule is that to defeat a patent by oral testimony of prior use the proof must be clear, satisfactory, and beyond reasonable doubt, but the standard is not an impossible one, and each case must be determined upon its own facts.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 104; Dec. Dig. § 81.*]

Appeal from the District Court of the United States for the Southern District of Iowa; Smith McPherson, Judge.

Suit in equity by Geiger, Fiske & Koop, copartners doing business under the trade-name of the Louisville Drying Machinery Company, against the Grupe Drier & Boiler Company. From an order granting a preliminary injunction, defendant appeals. Reversed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Charles C. Bulkley, of Chicago, Ill., for appellant.

Frank T. Brown and Charles M. Nissen, both of Chicago, Ill. (Brown & Hopkins, of Chicago, Ill., on the brief), for appellee.

Before HOOK and CARLAND, Circuit Judges, and VAN VAL-KENBURGH, District Judge.

HOOK, Circuit Judge. This is an appeal from an interlocutory injunction in a suit brought by Geiger, Fiske & Koop to enjoin the Grupe Drier & Boiler Co. from infringing the patent to George E. Chamberlain, No. 822,185, May 29, 1906, of which the plaintiffs are assignees. Of the seven claims of the patent all but the sixth are involved. The invention claimed is of an improvement in driers designed to prevent the choking up of the draft flue. The means specified is a removable conveyor in the bottom of the flue which cleans it without interfering with the operation of the drier. In its entirety the machine is for drying wet material. It is especially adapted to the drying of the spent grains of breweries and distilleries for preservation as feed. The drier proper is a large revolving cylinder the interior of which is heated by steam pipes or other means not interfering with its motion. It is mounted at an incline in order that the wet material fed into the upper end will flow downward and out at the lower. Fitted to the upper end of the drier cylinder, so as not to prevent its revolution, is a stationary cylindrical flue, with a large opening between them. The heating of the wet material in the revolving drier cylinder produces a vapor which interferes with the drying, so a current of air is forced or drawn through it and into, up, and out of the flue. This is generally done by a suction fan at the top of the flue. The course of the air is the reverse of that of the material being dried. Particularly in the case of wet grain the current of air is intended also to draw off and out of the top of the flue the worthless chaff, but in practice considerable of it not fully dried falls to the bottom of the flue and tends to choke the draft. At first it was the custom to clean the flue by hand, access being through a manhole, but the method was tedious and expensive, and interfered with the operation of the machine. The only element of the patented combination for which a claim of novelty can reasonably be made relates to the means of cleaning the flue. The patentee provided a conveyor in the bottom of the flue to carry the deposit back through the opening into the drier cylinder, where it was again subjected to the heated air. The first claim of the patent only need be set forth. It is:

"A drier comprising a drying-chamber, a flue communicating with said chamber, a feeding-conveyor and a flue-cleaning conveyor arranged in the lower portion of said flue."

[1] The defendant contends that if the patent is valid it is in very narrow compass which it does not infringe; also that the method described was old. It says that in the combination of the patent the conveyor which carries and feeds the grain into the upper end of the drier cylinder is separate and distinct from that which carries back into the same cylinder the deposit from the bottom of the flue, whereas defendant uses but one conveyor for both purposes. Infringement is

not avoided by the joinder of two parts of a machine into one if the new one performs the same functions in substantially the same way; but it is otherwise if the patentee has intentionally made their separability an essential feature of his invention. In each of the claims in suit the two conveyors, one for feeding in the grain and the other for cleaning out the chaff, are referred to as distinct, independent elements of the combination. The drawings and the specifications of the patent show them physically separated, though their operating power comes from the same shaft. In the specifications it is said that the feed conveyor "delivers the material to be dried to the drier-cylinder at one side of and below the major portion of the draft flue opening, so as to avoid the draft as much as possible." Chamberlain's application for the patent was filed in the Patent Office September 15, 1905. Eight days later, September 23d, while his application was pending, and before the assignment to the plaintiffs, he wrote as follows to a firm who were experimenting with a single conveyor for both feeding and cleaning, and who afterwards became interested in the defendant corporation:

"Answering your letter of Sept. 16th, while our improvements look very much alike on paper, as I wrote you the operating difference is radical, the one works the other fails. The reasons are briefly as follows: The amount of wet feed delivered to the dryer cannot be controlled by ordinary gates and slides. It is for this reason that the universal method of feeding dryers is by the use of helicoidal conveyers. * * * As stated in my earlier letter I installed your device six years ago at Marshalltown and gave it a thorough trial. . I have no doubt the same arrangement was tried long before my time by others and abandoned. All dryers are fed by a screw conveyer entirely independent of the vapor duct. It may be a little difficult to understand why one arrangement will work and the other will not. It is plain to me because I have seen the complete demonstration. I trust that my explanation as given above will convey the fundamental facts clearly. To conclude, your arrangement contemplates additional services from a conveyer that is already fully loaded. It don't make much difference whether you feed in at the top of the vapor duct or at its bottom. The conveyer cannot do more work than it is already doing. The better thing to do is to feed in as far from the vapor flue as possible. My device consists of a separate and independent screw conveyer properly housed at the bottom of the vapor flue. This conveyer is operated at a very slow speed dependent on the amount of material to be returned to the dryer. * * * I trust that this explanation will give you a clear idea as to where we differ and what my device consists of. Will be glad, to make further explanation if you desire."

The reason given by Chamberlain why the feed or grain conveyor could not also be used for carrying back the deposited chaff was that its capacity for the former purpose was always taxed, and it had to be boxed or inclosed to prevent spilling its contents. This objection was avoided by defendant by mounting two screw conveyors of different diameters tandem on one shaft, the smaller to convey the grain into the bottom of the flue where the larger took it and had a surplus capacity for the chaff. By this means, which was simple and effective, both the feed and the chaff deposit in the bottom of the flue were carried into the drier-cylinder. ·

[2] But we need not determine whether the separation of the conveyors ·is an essential feature of the patent or whether defendant's device of a single conveyor conflicts, because we think it clear beyond

reasonable question that the use of a conveyor in the bottom of the draft flue for carrying the deposit there back into the drier-cylinder was not new with the patentee. The statement of the patentee that six years before his letter was written he had given the double duty conveyor a thorough trial, and that he had no doubt others had tried the same arrangement long before his time, may be true, but it is not true that there had been no successful and continued application of the mechanical principle involved here. In the winter of 1897–98 three driers were installed in a distillery in Peoria, Ill. Endless chain conveyors had been used to clean out the flue by carrying the deposit back into the drier-cylinder, but as the iron corroded, they were not satisfactory. The draughtsman of an independent firm of millwrights employed by the distillery company prepared about January 1, 1898, a plan of the drying machinery. This plan was produced from the records of the company, and identified by the man who prepared it and by others. It shows a screw conveyor running along the bottom of the flue to the opening into the drier-cylinder and a wiper on each side to wipe the chaff to the conveyor. The arrangement of the plan was not adopted, but it shows quite clearly the parties had in mind a mechanical method of cleaning the flue by conveying the chaff back to be dried. The device they did adopt was evidently designed to perform both functions, wiping and conveying. Defendant's witnesses call it a spiral sweep, a reel, or a reel conveyor, while plaintiffs say it was merely a revolving series of paddles. A spiral effect was secured by bending strips of hard wood out of line and fastening the ends to the metallic arms of spiders mounted at each end of a revolvable shaft placed near the bottom of the flue. The spiral was several feet in length and 30 or more inches in diameter. In the first two driers the grain was delivered directly into the drier-cylinder, in the third it was delivered to the bottom of the flue where the chaff fell. Plaintiff's witnesses say this device would not convey, but would only stir up the deposit so it would be blown out by the draft. The evidence showed, however, that it actually worked as a conveyor and also by its large diameter wiped the sides of the flue. Those who designed and installed it were seeking something to replace the chain conveyor, and they had before them the draughtsman's plan. Moreover, had it not acted as a conveyor, the machine in which the feed was delivered to the bottom of the flue could not have been successfully operated. The device may not have been as effective as a screw conveyor, but the spirally disposed strips were similar in principle to the threads of a screw, and would naturally give a forward movement to the material they engaged. These driers so equipped were operated for about five years when they were destroyed by fire. In 1903 plans for a new installation were prepared and in 1903–04 new driers were constructed, with screw conveyors in the bottom of the flue. The application of the patentee was filed September 15, 1905. We do not stop to consider whether the actual use of screw conveyors at the distillery preceded the patentee's discovery but refer to it to show the natural development of the work of others acting independently and in ignorance of his efforts. If evidence is needed that the screw as a conveyor was

old it may be found in the patent to Ruggles No. 603,208, April 26, 1898. It would not be invention to substitute it in the place of an endless chain with paddles or other mechanical arrangement intended for and adapted to the same purpose. The spiral device was not an abandoned experiment as is contended. See Brush v. Condit, 132 U. S. 39, 48, 10 Sup. Ct. 1, 33 L. Ed. 251. It was used and served its purpose for five years, and when destroyed it was supplanted by the more efficient screw shown in the early plans.

[3] The rule is that to defeat a patent by oral testimony of prior use the proof must be clear, satisfactory, and beyond a reasonable doubt. The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; Deering v. Winona Harvester Works, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153. But the standard is not an impossible one, and each case must be determined upon its own facts. The particular kinds of flue cleaning devices installed in 1897–98 and 1903–04 would naturally have impressed themselves upon the memory of those who planned and put them in and of those who afterwards used them. The corroboration of the plan of the draughtsman is persuasive. It is not a case of casual observation of a mechanical detail by persons not particularly interested. These and other considerations, including the character of the witnesses and the fact that some of them appear wholly disinterested, have convinced us that a conveyor in the bottom of the draft flue to carry the deposit there into the drier-cylinder was not the discovery of the patentee. Even the statement of the patentee himself of the abandonment years before of attempts to make the conveyor do double duty contains an implication of knowledge of the value of each separately.

The decree is reversed.

VAN VALKENBURGH, District Judge, concurs in the result.