## CRONE v. JOHN J. GIBSON CO.

(Circuit Court of Appeals, Second Circuit. November 13, 1917.)

No. 30.

1. PATENTS ⟨⟩328—VALIDITY—STARTING DEVICE FOR GAS ENGINES.
   The Baldwin patent, No. 1,009,011, for a starting device for gas engines, claims 1, 2, 4, and 8, *held* void for anticipation by the McCadden patent, No. 756,879, and claims 3, 5, 6, and 7 for lack of invention in view of the prior art.

2. PATENTS ⟨⟩62—ANTICIPATION—EVIDENCE TO ESTABLISH.
   Written proof is not invariably necessary to establish anticipation.

Appeal from the District Court of the United States for the Western District of New York.

Suit in equity by Francis G. Crone against the John J. Gibson Company. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 237 Fed. 637.

This is an appeal from an interlocutory decree declaring valid and infringed claims 1, 2, 3, 4, 5, 6, 7, and 8 of letters patent No. 1,009,011, issued on November 14, 1911, to the plaintiff, Francis G. Crone, as assignee of Dayton A. Baldwin, inventor. The object of the invention was to provide an improved starting device for gas engines, by which the engine could have gasoline supplied to it independently of the carbureter. It presupposed the ordinary elements of a gas engine, to wit, a gasoline tank, two or more cylinders, a carbureter, a supply pipe between the tank and the carbureter, and an intake pipe from the carbureter to the cylinders. The patented improvement consisted in taking off from the gasoline supply pipe between the tank and the carbureter a lead of pipe which passed up through a pump, and from the pump led into the intake pipe beyond the carbureter, and close to the manifold. The pump was so devised as to draw raw gasoline from the supply line through itself, and to inject it into the intake pipe, along the sides of which it should trickle downwards towards the carbureter. The pump contained check valves, so organized that upon drawing up the piston gasoline would be drawn into the cylinder of the pump, and on pressing the piston down would be forcibly injected into the intake pipe. A valve, *V*, was inserted in the auxiliary pipe just below the pump, and a spraying nozzle within the intake pipe. The pump was indicated as fixed to the dashboard of the motor. The following are the eight claims in suit:

"1. The combination of a gas engine, a carbureter, an intake pipe extending from the carbureter to the gas engine, a gasoline supply, a pipe connecting therefrom to the carbureter, a branch pipe line extending from the supply and connected to the intake pipe, and means for forcing gasoline through the branch pipe into the intake.

"2. The combination of a gas engine, a carbureter, an intake pipe extending from the carbureter to the gas engine and having branches extending to the cylinders of the engine, a gasoline supply, a pipe connected therefrom to the carbureter, a branch pipe line extending from the supply and connected to the intake pipe at the point where the same branches to the cylinders, and means for forcing gasoline through the branch pipe into said intake pipe.

"3. The combination of a gas engine, a carbureter, an intake pipe extending from the carbureter to the gas engine, a gasoline supply, a pipe connecting therefrom to the carbureter, a spraying nozzle discharging into the intake pipe, a branch pipe line extending from the supply and connected to said spraying nozzle, and means for forcing gasoline through the branch pipe into said spraying nozzle.

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"4. The combination of a gas engine, a carbureter, an intake pipe extending from the carbureter to the gas engine, a gasoline supply, a pipe connecting therefrom to the carbureter, a branch pipe line extending from the supply and connected to the intake pipe, and a pump in this branch line for forcing gasoline into the intake pipe.

"5. The combination of a gas engine, a carbureter, an intake pipe extending from the carbureter to the gas engine, a gasoline supply, a pipe connecting therefrom to the carbureter, a branch pipe extending from the supply and discharging into the intake pipe, and a pump in said pipe line having valves opening toward the intake pipe.

"6. The combination of a gas engine, a carbureter, an intake pipe extending from the carbureter to the gas engine, a gasoline supply, a pipe connecting therefrom to the carbureter, a branch pipe extending from the supply and connected to the intake pipe, a pump in the pipe line having valves opening toward the intake pipe, and a valve in the branch pipe line below the pump.

"7. The combination in an automobile of a gas engine, a carbureter, an intake pipe extending from the carbureter to the gas engine, a gasoline supply, a pipe extending therefrom to the carbureter, a branch pipe line extending from the supply to the intake pipe, and a pump in this branch arranged on the dash of the automobile.

"8. The combination, with a gas engine, of a gasoline supply, an intake pipe connected with the gas engine, a branch pipe for conducting fuel from the supply to the intake pipe, and a carbureter connected with the supply and intake pipe independently of the branch pipe and between the intake pipe and the connection of the branch pipe with the supply."

The defendant raises no substantial question of infringement, but attacks the validity of the patent. At the first hearing the court held the patent invalid under the patent to Steele, 992,920, whose date of application was earlier than that of the patent in suit, but upon application later evidence was introduced to show that Baldwin's device was in fact invented earlier than the application date of Steele, and the court therefore concluded that Steele was not an anticipation. From this conclusion the defendant does not appeal, but rests its case rather upon certain other patents introduced on the rehearing, of which the most important is that issued to McCadden, 756,879, which, together with certain other patents introduced at the first hearing, it claims show anticipation. These patents are Riotte, 696,146, Robinson, 565.033, Gaskill, 742.134, and Rogers, 661,078; but this decision treats only McCadden and Riotte.

The court below considered chiefly the McCadden patent, and decided that, although it was a close reference, the plaintiff had successfully distinguished it, since McCadden had connected the priming device directly to the carbureter, thus making it in a sense a dependent upon it in priming the cylinder, instead of being independent, as Baldwin had made it.

Some hundreds of devices have been manufactured by the plaintiff under the patent in suit, but less than a thousand in all, and he has secured a contract from the Pierce Arrow Company for a royalty of 75 cents upon all motors built by them. With this exception there is no evidence in the case of any use of the patent itself.

The McCadden patent, on which the defendant principally relies, relates to carbureters for internal combustion and has three purposes: First, to provide a suction feed for the carbureter; second, to locate the fuel supply below the carbureter; and, third, for an instantaneous primer. The third feature alone concerns this case. The patent shows a tube or pipe immersed in the fuel supply at the very end of which above the tank is a bulb. The compression of this bulb drives the fuel through the tube or pipe which terminates in the upper part of the mixing chamber of the carbureter itself. The gasoline being injected into this mixing chamber trickles down its sides and probably gathers at the bottom. The intake pipe extends down into the mixing chamber to within a short distance of its bottom. The normal source of supply for the engine comes from the fuel tank past a needle of the usual kind into an aspirating chamber, where it is in part mixed with air. A valve

normally closes one side of this suction chamber, but when suction is applied from the engine this valve is unseated, and the gas and air in the suction chamber are drawn into the mixing chamber, whence they leave through the intake pipe into the cylinder itself. The most salient difference between McCadden's patent and Baldwin's rests in the fact that the opening from the priming pipe does not give directly into the intake pipe, but into the mixing chamber, and it is upon this point particularly that the plaintiff insists.

Riotte's patent exhibits a pump with check valves of the same general character as that shown in the patent in suit, directly adjacent to the carbureter tank. By the use of this pump an added supply of gasoline is brought to the aspirating needle of the carbureter itself. The defendant seeks to use the reference only to show that the kind of pump used was old in the art.

Josiah McRoberts, of Chicago, Ill. (A. Parker Smith, of New York City, and Clifford Nichols, of Buffalo, N. Y., of counsel), for appellant.

J. William Ellis, of Chicago, Ill., for appellee.

Before WARD and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). [1] We consider the McCadden patent an anticipation of claims 1, 2, 4 and 8. If the orifice, $u$, of Figure 1 of that patent had opened into the intake pipe, $r^1$, of that figure, it could not be even colorably argued that the devices were not identical as respects the features of these claims. There is no warrant for saying that the fuel supply, $s$, is an auxiliary to the main tank; only one fuel supply is mentioned, and it is the same tank as is to be located below the carbureter proper (page 1, lines 96 to 100). There is equally no warrant for saying that the device was not intended to apply to gasoline engines. The only reason given for a contrary conclusion is that the patent applies only to "internal combustion" engines, and that "gasoline" is nowhere mentioned, but rather "oil." This is not sufficient; gasoline engines were a well-known form of internal combustion engine in 1903, the date of the application, and unless there was some expression to the contrary, there would be no ground to hold that the phrase did not cover gasoline engines along with the rest. The omission of the word "gasoline" may well have been because other sorts were intended. No proof is suggested that the primer will not work with gasoline, or that the "carbureter," a term appropriate, if not exclusively appropriate, to a gasoline engine, is not suitable in its structure to such engines. The supposed heating cup, which is unmarked, does not seem to us necessarily to be such. It is quite as likely to have been the handle of a drainage plug; we incline so to regard it.

Nor do we appreciate the importance of the position that the primer must be "independent" of the carbureter. If by this is meant that the primer must work independently of the flow of gasoline into the carbureter, it is so in McCadden. If it is meant that the air must come into the mixing chamber independently of the valve, $i$, it is not so; but we cannot see that this is in any sense a feature of Baldwin's patent. The adverb "independently," in claim 8, only refers to the supply of gasoline to the primer, which must be independent of the

flow through the carbureter, as it is. We must remember that it was this auxiliary supply of gasoline which both patents sought to achieve, and not the supply of air, which was always adequate, whether the weather were cold or hot.

There is no reason to impugn the operability of McCadden's disclosure. The valve, $i$, might not open, it is true; but we must assume that it would. The patent is entitled to the usual presumption of operability; it has passed the expert examiner, and it stands without challenge in the evidence. We are certainly not qualified to pass upon that question, and we take it as we find it. So, too, of the operation of the priming device. In just what form the injection will reach the orifice, $u$, we cannot say. It may be as solid liquid, or it may be mixed with air; much would seem to depend upon the size of the pipe, $t^2$. Some may gather at the bottom of the mixing chamber, or it may all trickle down the sides, or be evaporated in the air. We cannot pass upon this, but we must take the apparatus as capable of doing what the patentee set out to do, because it has passed the official in charge of such matters as so capable, and no competent person has challenged his conclusion. We are not experts in such matters.

Coming, therefore, to the crux of the controversy, we see no reason to suppose that it was patentable invention to inject the priming charge into the intake pipe at the manifold, rather than into the mixing chamber of the carbureter itself. There is no place in either system where one can say that functionally the mixing chamber ends and the intake pipe begins. For example, Dorsey, the plaintiff's expert (folios 668, 669), concedes that the mixing is not completed in the carbureter proper, and that one purpose of a long intake pipe is to secure a better mixture than if the cylinder were more directly connected. We must remember that the carbureter is no more than an inclosed space into which both gasoline and air are freely drawn, so that the mixture may be established. Since the mixture continues until the two gases arrive in the cylinder, it is only an arbitrary division which sets the limit at the precise confine of the carbureter proper. We do not, of course, mean to say that the place at which the priming charge is admitted is indifferent in the operation of the primer; it may well be that Baldwin's device is superior, in admitting it where gravity will spread it over the sides of the intake pipe in greater area than is possible in McCadden. All we say is that, viewing the mechanism functionally, it is only a question of which form is the optimum in a scheme whose general purpose and means of realization are the same.

[2] If the idea of priming the engine at the manifold were of itself entirely new, more could be said for the novelty of the invention; but it was not. Bate and Birdsall had so placed the priming cups that they opened exactly at that spot, and whatever advantage came from injection just there Baldwin did not discover. The plaintiff complains of the proof upon this point in that there is no written corroboration at least prior to 1910. This is true, yet in the case of Birdsall, at least, there is no reason to question the adequacy of the oral proof. His recollection is detailed, and he has no possible motive to falsify. Written proof is not an invariable necessity. Lee v. Upson (C. C.) 43

Fed. 670, 671; Sipp v. Atwood, 142 Fed. 149, 154, 73 C. C. A. 367; Grupe Co. v. Geiger, 215 Fed. 110, 114, 131 C. C. A. 418. We may accept his testimony that he did pipe his priming charge into the manifold in 1905, and the plaintiff's invention, therefore, depends upon whether it was enough to adapt McCadden's pump and piping, so that the injection should be where Birdsall put it.

As in all cases the best test of invention is the history of the art, when that throws any light. Here the plaintiff urges that there had been a series of failures finally capped by Baldwin's success. It is true that the initial priming of a gasoline engine was a difficulty experienced from the outset not only in the motor car, but in the stationary engine. There are a number of patents designed to meet the difficulty, and if it were true that each was designed to meet the same problem as Baldwin's patent, there would be force in the assertion. We do not regard them as such efforts. The difficulty develops when one cranks the engine at the start, and the device of a few drops of raw gasoline was an obvious and early expedient. A hand pump connected with the supply might originally have been an invention—we are not prepared to deny it; but McCadden had that and Riotte did the same. Riotte, it is true, pumped into the carbureter; it was a "tickler," so called, but it obviated the necessity of opening the tank and dipping out the gasoline to charge the priming cup, which was Baldwin's chief purpose. Moreover, its location was more convenient before the days of self-starters than a pump on the dashboard. The only advance that we can see, therefore, still remains in the location of the outlet. As to this, we cannot ignore that, at about the same time as Baldwin, it was completely disclosed by Crone, Case, and Steele, a circumstance rightly considered of significance when the question arises of the necessity of uncommon originality to the problem. Elliott Co. v. Youngstown Car Co., 181 Fed. 345, 349, 104 C. C. A. 175. Such a showing suggests rather that the art had at about that time made the device presently appropriate in the development of the motor car than that it had theretofore baffled the powers of inventors. We incline to regard the patent as one of those added conveniences which have arisen and are continually arising after the main structural features of the motor became fixed, and that the necessary modifications from what went before did not call for any powers out of the common.

We are strengthened in this conclusion, first, by the fact that the patent has no presumptive validity over McCadden, which was not cited against it, and because its success has not hitherto given any warrant for the belief that it was coveted as an important feature of the equipment of a motor. Although the invention is 10 years old and has been patented for 6, Crone has sold less than 1,000, and has got a royalty of 75 cents and from only a single company, which, making, as it does, an expensive car, presumably does not sell great numbers.

Claim 3 is for a spray nozzle, which will hardly be claimed to constitute an invention over the other claims.

Claim 7 locating the pump upon the dashboard is the same.

Claims 5 and 6, of which 6 has certainly no patentable addition to 5,

are for the same kind of pump as Riotte disclosed as an auxiliary or "tickler" to the carbureter proper. It was not invention to substitute such a pump for McCadden's bulb.

The decree is reversed, and the bill dismissed, with costs.