## MEAD–MORRISON MFG. CO. v. HAUCK MFG. CO.

(District Court, E. D. New York. February 2, 1926.)

No. 2046.

1. Patents ⬷═62—Party must establish anticipation beyond a reasonable doubt, to declare patent invalid.

Anticipation must be established beyond a reasonable doubt, in order to declare patent invalid.

2. Patents ⬷═328—1,405,146, claims 1, 2, 3, 4, 7, 8, 9, 10, 11, for improvement in forges, held valid and infringed.

Patent No. 1,405,146, claims 1, 2, 3, 4, 7, 8, 9, 10, 11, for improvement in forges, *held* valid and infringed.

In Equity. Patent infringement suit by the Mead-Morrison Manufacturing Company against the Hauck Manufacturing Company. Decree for plaintiff.

Emery, Booth, Janney & Varney, of New York City (Frederick L. Emery, of New York City, and L. G. Miller, of Boston, Mass., of counsel), for plaintiff.

Stephen J. Cox, of New York City, for defendant.

CAMPBELL, District Judge. This is an action in equity, brought by the plaintiff, who is now the owner of patent No. 1,405,146, issued by the United States Patent Office to John A. Mueller, for improvement in forges, dated January 31, 1922, against the defendant, to restrain the alleged infringement of the said patent and for damages. The defendant interposed the defenses of invalidity and noninfringement.

This action is based on claims 1, 2, 3, 4, 7, 8, 9, 10, and 11 of the patent in suit, which read as follows:

"1. A device of the character described comprising a heating chamber having an opening at the top to permit manipulation of the material, and means to guide the flame across said opening and then downwardly to the material to be acted on in said chamber.

"2. A device of the character described, comprising a heating chamber having an opening at the top to permit insertion and removal of the material, means to guide the flame downwardly to the material to be acted on in said chamber, and means to direct a portion of the flame to said guiding means, and to direct another portion above said guiding means.

"3. A device of the character described, comprising a heating chamber having an opening at the top to permit insertion and removal of the material, means forming a part of the wall of said chamber to guide the flame downwardly to the material to be acted on in said chamber, and means to direct the flame so as to deflect the waste gases away from said opening as they rise from the chamber.

"4. A device of the character described, comprising a heating chamber having an opening at the top to permit insertion and removal of the material, means forming a part of the wall of said chamber to guide the flame downwardly to the material, and means to direct a portion of the flame to said guiding means, and to direct another portion

above said guiding means through said opening."

"7. A device of the character described, comprising a heating chamber having an opening for manipulation of the material and means which guide the flame to said chamber, and which control the escape of heat through said opening, so as to confine such escape to a desired portion of said opening.

"8. A device of the character described, comprising a heating chamber having an opening at the top for manipulation of the material, a blast to convey fuel to act on said material, and means to direct the blast across and directly beneath said opening, and then downwardly to the material to be acted on in said chamber.

"9. A device of the character described, comprising a heating chamber having an opening at the top for manipulation of .the material, and means to provide a direct blast across and directly beneath said opening; said blast conveying fuel to act on said material.

"10. A device of the character described, comprising a heating chamber having an opening at the top for manipulation of the material and for the venting of spent gases, said chamber being formed at the bottom to receive and hold the material while it is being acted upon, a blast to convey fuel to act on said material, means to direct the blast clear across and immediately beneath said opening and above the material, and means to direct the blast downwardly to the material to be treated, after the blast has been directed across said opening.

"11. A device of the character described, comprising a heating chamber having an opening at the top for manipulation of the material and for the venting of spent gases, said chamber being formed at the bottom to receive and hold the material while it is being acted upon, and also formed with a deflecting wall, and means to direct a blast clear across and immediately beneath said opening and above the material, said deflecting wall directing the blast downwardly to the material to be treated after the blast has been directed across said opening."

The arrangement disclosed by the patent in suit in substance consists of a box made of ordinary fire brick, open at the top with a torch of ordinary construction, projecting into it through a relatively small opening at one end, and an inclined wall at the other end, to deflect the flame which crosses from the burner beneath this opening, and above the bottom downwardly on the rivets at the bottom of the chamber.

The flame and hot gases of combustion, after striking the rivets, swirl around and rise from the bottom of the chamber into the path of the direct blast, and are pushed forwardly in the direction of this blast, so that, as they rise from the top of the chamber, they move in a direction away from the operator.

In the patentee's preferred form a portion of the flame passes from the burner directly over the front edge of the inclined brick and causing the exhaust gases to move more rapidly to the rear.

One object of the invention is described by the patentee in his specifications, as follows:

"One object of my invention is to provide a device having an efficient heating chamber, combined with a conveniently located opening, to be used, not only for insertion, but also for removal, of the material, my device being especially useful for heating rivets, although other material may be advantageously heated."

And a feature of the invention with which we are concerned is also described by the patentee in his specifications as follows:

"In providing means to deflect the blast into. operative relation with the material to be acted upon, combined with an opening over the blast suitable, not only for insertion, but for removal, of the material, the fuel whirling in the chamber, and some being again deflected downwardly by the entering blast, so that the space just above said opening is comparatively cool and accessible to the operator."

Also, according to the specifications, there are two other features of the invention, "co-operating walls on the nozzle and cap," and "guards to protect the nozzle and still permit access thereto," but, as they are neither described in detail nor claimed, no further consideration need be given to them.

The defendant introduced in evidence as prior art 11 United States patents, as follows: Nice, reissue No. 13,834, for heating furnace, dated December 1, 1914; Crampton, No. 111,616, for improvement in furnaces for burning pulverized fuel, dated February 7, 1871; Kite, No. 238,695, for hydrocarbon furnace, dated March 8, 1881; Barse, No. 345,356, for furnace for heating glass pots, crucibles, blanks, etc., dated July 13, 1886; Stevens, No. 348,700, for apparatus for burning petroleum, dated September 7, 1886; De Rome, No. 782,438, for furnace,

dated February 14, 1905; Best, No. 941,609, for heating and melting furnace, dated November 30, 1909; Regan, No. 1,004,200, for oil-burning blacksmith's forge, dated September 26, 1911; Case, No. 1,077,803, for oil forge for drill steel, dated November 4, 1913; Tierney, No. 1,269,132, for furnace, dated June 11, 1918; Mahr, No. 1,285,761, for forging and annealing furnace, dated November 26, 1918—and one British patent, viz.: Newton, No. 21,634, for improvements in gas furnaces, dated December 10, 1891.

In none of these patents, as I read them, is there a normally open opening at the top through which the work is removed and inserted, and which is the normal exhaust vent for waste gases; and my opinion is not changed by the contention of the expert, who was called by the defendant, with reference to the De Rome patent, No. 782,438, the Nice patent, No. 13,834, the Stevens patent, No. 348,700, or the Mahr patent, No. 1,285,761, because, clearly, in none of them was there any disclosure of the invention of the patent in suit, and none of them could be reconstructed to perform its functions without, in fact, rebuilding them in accordance with the teaching of the patent in suit.

Of course, it was known before the filing of the application for the patent in suit that metal could be heated other than by a direct blast of the flame; but the novel features of the patent in suit were not disclosed by the prior art, nor is the construction of the claims of the patent limited by the prior art as shown in this action.

In addition to the particular forges, A, C, and D, offered in evidence by the defendant, which we will consider later, the defendant also offered evidence as to other devices manufactured by it, and but three of these, a blacksmith's forge, a soldering iron heater, and a changeable forge, deserve any particular attention.

In the blacksmith's forge (Defendant's Exhibits G and I) the flame sweeps upwardly through an opening in the top, over which devices are placed, and if the rivets were placed in the forge, through such opening, they would be exposed to the direct blast of the flame, and they could not be reached, except with long tongs, without exposing the hands to the flame.

In the soldering iron heater (Defendant's Exhibits H and J) the opening is on the side in which the irons are placed and subjected to the direct blast of the flame. There is no opening in the top.

In the changeable forge (Defendant's Exhibit X) the openings for inserting work are arranged at the sides, and I am unable to see wherein it resembles the patent in suit.

This brings us to the consideration of what appears to be the defendant's main defense, its own prior use. The defendant offered in support of this defense the testimony of those who were in its employ at the time it contends that the forges were used, and the story told by its witnesses in brief is as follows:

The witness Trier, not now employed by defendant, but the president of a corporation dealing in automobile supplies, says that he was from 1915 to 1920 in the employ of the defendant, first in a branch shop on Baltic street, Brooklyn, where rivets were being used in manufacturing some of defendant's products, and while so engaged he made first of loose fire bricks, from time to time, a forge similar to Defendant's Exhibit A, in which to heat rivets, the flame being furnished by a portable kerosene torch. Because of the desire to have a permanent portable forge, the witness Trier says that later a structure similar to Defendant's Exhibit C was built in a sheet iron box with a handle, so it could be carried around.

The defendant had been conducting its business with its main office and shop on Livingston street, and the branch shop on Baltic street, but, desiring to consolidate its business at one place, built a building on Eleventh street, Brooklyn, into which it moved about the end of October, 1917. The witness Trier says that, after the removal of the defendant to the Eleventh street building, a forge was built utilizing a compressed air burner similar to Defendant's Exhibit D.

The witness Trier is corroborated to a greater or lesser degree by the witnesses Corralo, Osbahr, Heinz, and Davis, who were workmen in the employ of the defendant, by Miss Van Voorhis, who was in the employ of the defendant, first as a stenographer, then as a bookkeeper, and later in the sales and advertising department, and by Mr. Moore, who was a director and engineer of the defendant, and for a time after Mr. Hauck's death, which occurred in the first part of November, 1920, in charge of the management of the business.

These forges are said to have operated exactly like that of the patent in suit, but the witnesses certainly were not in complete agreement on this point. The fact that these men were in defendant's employ during the time they claim to have operated the forges was clearly shown by the books of

the defendant, and the existence of the Baltic street shop at the time it is claimed the original forges were used, as well as the removal to the Eleventh street building in the last part of October, 1917, are also sufficiently shown; but no original forges were produced, and no evidence was offered from which it can be determined that there are any in existence, notwithstanding the fact that it was contended by the witness Elze that sales had been made of forges of the Exhibit D type, and there was no evidence offered that the books of the defendant had been destroyed.

The testimony was that the sole remaining forge of the Exhibit D type had been scrapped as useless and not salable when Mr. Gerdes assumed control of the defendant in 1921, and was attempting to reduce for income tax purposes an inventory which included much that had no value.

There is no documentary evidence, the date of which is sufficiently established as prior to May 29, 1919, the date of the filing of the application of the patentee of the patent in suit, because the date when the photograph No. 826 (Defendant's Exhibit M) was taken is not shown by documentary evidence, but solely by the recollection of Miss Van Voorhis, which was that it had been taken in 1918.

There was also another photograph of the same forge, No. 825 (Defendant's Exhibit F), showing a boy operating it; but he was not identified or called, nor was it shown when he was in defendant's employ. The man who took the photograph was not called, and, even if he was in a condition where he had difficulty in speaking, he could have been examined by taking his deposition.

I do not believe any of the witnesses are deliberately telling an untruth, but there is considerable contradiction in their testimony as to the way in which the forges operated, and while the witnesses who claimed to have worked on the forges agree that the rivets could be safely removed by tongs of 12 inches or shorter in length, the picture, No. 825, in bulletin No. 114 (Defendant's Exhibit F), in which a boy is shown as operating the forge, shows that he used tongs very much longer than 12 inches.

Regardless of the fact that the defendant's witnesses were first requested to describe the forges, still that does not, under the circumstances, convince me that they may not have been in error, and especially as to Exhibit A, which represented a forge which was rebuilt from time to time, when knocked down, and undoubtedly assumed many forms, and also as to Exhibits C and D, which apparently did not satisfactorily perform what was required of them, inasmuch as the last of Exhibit D type was scrapped, and if it had been satisfactory, and sales had been made of them from 1919 on, as testified by defendant's witness Elze, I do not see why proof of such sales, giving the name of the purchaser, was not made, and the explanation of the defendant's witness Moore for the failure of the defendant to introduce such forges in quantity on the market does not change the fact that evidence of such sales as defendant claims were made should have been given.

A consideration of the cut No. 825, in defendant's Exhibit F, in view of the testimony of the defendant's expert on the trial as to the function performed by the front of the forge, may in some manner account for the apparent lack of success of that forge.

As to the time fixed as that of the taking of the photograph No. 826 by the witness for the defendant, I believe she was in error, as it seems to me to be more probable that the same was taken in the fall of 1919, in preparation of the bulletins which she was preparing the latter part of that year for issue in 1920, and that said bulletins were intended to be issued in 1920, because the statement therein, about "twenty years' experience," fits in with 1920, as it was stipulated that Mr. Hauck, who then controlled the defendant, had commenced the line of business then being pursued in 1900, and further because it seems to me that better proof than the recollection of the witness could have been furnished, by calling the printer with his records, and also the maker of the plates for such bulletins, and the best obtainable evidence should have been produced, if we are to accept the explanation that work was done in October or November, and not paid for until May or June.

[1] Persuasive as the testimony of the defendant's witnesses appears to be, when first heard or read, and however truthful they may be, still, when analyzed carefully, and unsupported as it is by documentary evidence, prior to the filing of the application by the patentee of the patent in suit, I do not believe that it is sufficient to establish the clear conviction, beyond a reasonable doubt, which the law requires to show an anticipation of the patent in suit. Deering v. Winona Harvester Works, 15 S. Ct. 118, 155 U. S. 286, 39 L. Ed. 153; Adamson v. Gilliland, 37 S. Ct. 169, 242 U. S. 350, 61 L. Ed. 356;

T. H. Symington Co. v. National Castings Co., 39 S. Ct. 542, 250 U. S. 383, 63 L. Ed. 1045; Eibel Co. v. Paper Co., 43 S. Ct. 322, 261 U. S. 45, 67 L. Ed. 523.

The defendant cites National Casket Co. v. Stolts, 157 F. 392, 85 C. C. A. 300, and Crone v. John J. Gibson Co., 247 F. 503, 160 C. C. A. 13, the only two cases that I have found which have sustained a claim of prior use solely on oral testimony. These cases are exceptions to the general rule. They were decided upon the peculiar facts in each case, and from them the case at bar is clearly distinguishable.

The prior art does not limit the construction of the claims, nor are the same limited by the file wrapper history beyond the natural meaning of their language. Claims 2 and 4 are limited to the preferred form of the construction involving the splitting of the flame at the edge of the inclined back; but all of the other claims in suit are not limited to this subject-matter, and I entirely disagree with the defendant's expert in his attempt to so construe the remaining claims.

All the claims at issue of the patent in suit clearly read on defendant's structure (Plaintiff's Exhibit 3). That the general direction of the flow of gases in defendant's structure is downwardly to the work, and then upwardly and away from the operator, clearly appears from Defendant's Exhibit K, the testimony of the patentee of the patent in suit, and of the defendant's expert. The splitting of the flame, as detailed in claims 2 and 4, is also found in the defendant's structure, as appears from Defendant's Exhibit K, and the testimony of the patentee of the patent in suit.

The patent in suit is a meritorious patent, entitled to a liberal interpretation, and entitled to a range of equivalents ample to secure to the inventor the invention he has made. Not only do the claims of the patent in suit on which this action is based read upon the defendant's structure, but there is a similarity of result attained by equivalent means.

The mere fact that the actual line of the burner in the defendant's structure strikes considerably lower down does not prevent the splitting of the flame, because the action of the flame in the closed box tends to raise it out of the axial line, so that part passes over the top of the back. The striking of the flame directly against the corner of the brick which it shoots over is shown in Defendant's Exhibit K.

There is no presumption that the novel features of the patent in suit are not present in defendant's structure, simply because the defendant may at times use an air curtain, for the reason that the defendant's structure functions satisfactorily without such air curtain, as appears from the testimony of the patentee of the patent in suit and the defendant's expert.

[2] The patent is valid and infringed. A decree may be entered in favor of the plaintiff, with costs.

Settle decree on notice.