**SBICCA–METHOD SHOES, Inc., v. M. WOLF & SONS, Inc.**

**No. 7334.**

District Court, E. D. New York.
April 22, 1935.

Watson, Bristol, Johnson & Leavenworth, of New York City (Clair V. Johnson, David A. Woodcock, and Charles P. Bauer, all of New York City, of counsel), for plaintiff.

Briesen & Schrenck, of New York City (Hans v. Briesen and Fred A. Klein, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This action is brought for the alleged infringement of United States patent No. 1,838,708, issued to Frank Sbicca, assignor to Sbicca-Method Shoes, Incorporated, for Shoe and Method of Making Same, granted December 29, 1931, on an application filed February 2, 1931; and patent No. 1,902,725, issued to Frank Sbicca, assignor to Sbicca-Method Shoes, Incorporated, for Method of Producing Complementary Insole-Outsole Combinations, granted March 21, 1933, on an application filed November 7, 1931.

The corporate identity of the plaintiff and its title to the patents is conceded.

The plaintiff is a Delaware corporation and engaged in exploiting the alleged inventions by issuing licenses under the patents in suit to shoe manufacturers.

The defendant is a New York corporation, and has a regular and established place of business in the borough of Brooklyn, in the Eastern District of New York,

---

[1] No opinion for publication filed.

where it is engaged in manufacturing shoes in the manner and of the type which are alleged to infringe the patents in suit.

Suits are pending in this court brought by the same plaintiff against the following defendants: Andrew Geller Shoe Manufacturing Company, Inc., Equity No. 7330; Benjamin Dickstein, Equity No. 7331; Premier Shoe Co., Inc., Equity No. 7332; and Schwartz & Benjamin, Inc., Equity No. 7333—all of whom have shoe factories in the borough of Brooklyn, in the Eastern District of New York.

It has been stipulated that the processes and products of all of the said defendants are the same as those of the defendant herein, and that the court's decision herein will control the other cases hereinbefore enumerated.

Notice to all of the defendants in this and the other actions enumerated is admitted.

The defendant herein, and each of the enumerated defendants in the other suits, is licensed under the Maccarone patent No. 1,569,823, by Del-Mac System Corporation, a New York corporation, which was formed with the patentee Fred Maccarone as vice president, and Herman B. Delman, as president, who was also the president of Delman, Inc., a shoe manufacturing corporation, in New York City; the name Del-Mac having been made up from the first syllables of the words "Delman" and "Maccarone."

Maccarone and the Del-Mac System Corporation are controlling the defense in this case, and Mr. Delman has personally contributed quite substantially to the defense.

The defendant's expert familiarized himself with the process herein complained of by observing commercial operations at Delman, Inc., which he was advised were the same as those of the defendant.

The defendant has interposed an answer raising the issues of invalidity and noninfringement.

The patents in suit relate to the manufacture of shoes in which insoles and outsoles are formed by division of single pieces of sole leather. The first patent in suit relates to one method of forming such a sole and the subsequent steps of forming a cemented shoe therewith; and the second patent in suit relates to another method of forming an improved

sole of that type, and also claims the article per se.

The first patent in suit, No. 1,838,708, relates to method of constructing shoes. It contains two claims, but only claim 2 is in suit.

The second patent in suit No. 1,902,-725 contains four claims, three relating to a method of stock fitting sole, and one to the product. All of the claims are in issue.

The objects of the alleged invention of the first Sbicca patent in suit No. 1,838,708 are set forth in the specification, as follows:

"My invention relates to new and useful improvements in shoes and the method of making the same, the primary object of the invention being to provide an improved method of making women's shoes so that the shoe when completed will give the effect of what is known as a turned shoe, but in effect is made similar to a shoe produced by what is known as the cemented shoe process, yet differs from both of them and overcoming the many objectionable features of both of the aforesaid shoes.

"A further object of the invention resides in providing a method wherein but a single sole is used, thus eliminating the objectionable features of an inner sole, such as is used in the 'McKay' process, the cemented shoe process and similar processes.

"A further object of the invention resides in the provision of a process for making shoes which will produce rigidity and strength at the portions thereof requiring the same but which will eliminate unnecessary thicknesses at the portions of the shoe where thinness and lightness are most desirable.

"A further object of the invention resides in providing a shoe which is light in weight, durable under the heaviest wear and one which will avoid squeaks.

"Still another object of the invention resides in using a single sole from which is cut a marginal sole strip applicable to the last and to which the upper is secured prior to the application of the sole proper."

The method of constructing a turned shoe, briefly summarized, consists in applying an outsole bottom side down on a last and stitching the lasting allowance of an upper, while wrong side out on

the last, to a channel leaf of the sole; trimming the excess lasting allowance; then removing the shoe from the last; turning it right side out; relasting it and hammering or molding it on the last until it assumes the shape of the finished product. For a completed turned sole shoe see Plaintiff's Exhibit 7–C.

The method of constructing the cemented shoe, briefly summarized, consists in placing a solid insole on a last, placing an upper on the last right side out, and lasting it to the insole with cement, trimming, roughing, and coating the lasting allowance with cement, placing a filler over the center of the insole, preparing a roughed and cemented outsole, and then cementing the outsole to the lasted upper while still on the last. For a completed cemented shoe, see Plaintiff's Exhibit 8–C.

The method of constructing a "McKay" shoe, briefly summarized, consists in using a solid insole, bottom filler, and lasting operation similar to the cemented shoe, and then delasting the shoe and stitching an outsole to the lasted upper through a channel formed in the grain side of the outsole, after which the channel leaf is cemented down to hide the stitches. For a completed "McKay" shoe, see Plaintiff's Exhibit 9–C.

The patentee by the last paragraph of the specification showed that he did not intend to limit himself to the exact details of construction shown and described, as he said: "While I have particularly described the elements and steps best adapted to perform the functions set forth, it is obvious that various changes in form, proportion and in the minor details of construction may be resorted to without departing from the spirit or sacrificing any of the principles of the invention."

Claim 2 of the first patent in suit reads as follows: "2. The method of constructing a cemented shoe consisting in providing a sole of the desired final sole thickness in the finished shoe, removing from the edges of the upper surface of the ball section and adjacent portions of the shank section of the sole a rand of less thickness than the sole and reducing the thickness of the shank and heel portions of the sole, by removal of material from the upper surface thereof, to the thickness of the marginal portions of the ball section thereof, lasting an upper upon a last to which said rand and a shank piece to which the rand is secured have been applied, and permanently securing the upper to the rand and the edges of the shank piece, and permanently attaching the sole to the upper, the rand, and the shank without delasting the shoe."

This patent does not particularly disclose any shoe structure nor the method of making a shoe, but seems to be a method of making a sole structure. It discloses a sole having a skeleton insole and an outsole having the elevated central ball portion with the reduced marginal edge about the ball and forward part of the shank of the insole. In making the rand portion of the sole, Sbicca cuts the ordinary seam channel found in sewed shoes, which is shown at the left of Fig. 2, which channel forms a beveled edge about the central portion of the outsole.

After the forming of this channel, the outer portion of the edge of the outsole is given a horizontal cut, which separates a rand from the outsole structure about the ball. The shank portion of the sole blank is split, and the portion of the leather which is removed from this shank portion becomes waste.

Prior to the lasting operation, a piece of paper is placed on the last. The rand portion 2 of the insole is then fastened to the last, and a separate shank portion 6 is then applied to the last, the rand portion being secured to the shank portion.

A completed shoe having a sole, combination insole and outsole, produced as described in the patent, is shown in crosssection in Fig. 17.

The substance of the patent relates to cutting out a marginal strip, as it is described in the specification or rand as described in the claim, by the use of knives, and likewise cutting out the heel and shank portion of a sole.

This patent states that the upper may be secured to the outsole after application of the insole by one of three methods, cementing, stitching, or nailing, which are practically alternative methods.

The second patent in suit, No. 1,902,-725, contains four claims, three to a method of stock fitting soles, and one to the product. All of the claims are in issue.

The specification says that the invention relates to complementary insole-out-

sole combinations and to a method of producing the same.

It then points out what the patentee considers the difficulties encountered in the practice of the prior art, particularly with respect to the inaccuracy of fitting outsoles to insoles and the waste of material involved, and contends as follows:

"An important' object of the present invention is the provision of a method of producing complementary insole-outsole combinations in which all waste is eliminated and an absolute fit assured between the insole and outsole in the completed shoe.

"A further object of the invention is the provision of a method of producing such combinations which may be readily carried out at the factory and by use of machines commonly employed at the factory with but slight modifications thereof.

"These and other objects I attain by the construction shown in the accompanying drawings wherein, for the purpose of illustration, I have shown a preferred embodiment of my invention. * * * "

The specification ends with the following two paragraphs:

"The process employed in the production of shoes by use of combinations of this character is preferably that set forth in my prior application above identified, but may obviously be employed in the production of other shoes, as for example, shoes produced by processes similar to that described in the patent to J. A. Kelly, granted August 31, 1926, No. 1,597,-685, for art of making shoes.

"Since, as hereinbefore noted, the particular order of the steps employed in the production of the insole is immaterial, it is to be understood that I do not wish to be limited to the order of recitation thereof in the appended claims."

Claim 1 may be taken as typical of the process claims 1 to 3, and claim 4 covers the product.

Claim 1 reads as follows:

"1. The method of producing complementary insole-outsole combinations comprising the following steps, providing a leather sole blank of the desired thickness of the outsole and having a grain and a flesh side, splitting the heel and shank portions of the sole blank to form insole and outsole shank pieces, removing a rand from the margin of the ball section of the flesh side of the sole while leaving the same attached to the forward end of the insole shank piece, and splitting the sole between the shank and ball sections by a cut extending inwardly from the flesh side thereof to the depth of the desired insole and between the rand terminals."

"4. A unitary insole having an internally beveled marginal frame at its ball section, said insole comprising the flesh side of a sole blank from which a unitary outsole has been removed, said insole having its lower surface including said beveled marginal wall of said frame exactly complemental to the upper surface of the removed outsole."

The second Sbicca patent clearly explains what went before it, but is very vague as to what is to be accomplished by it.

In the specification it is explained that, in the production of light-soled shoes, it has been proposed to employ an outsole having a rand removed from the ball section thereof, and having the heel and shank portions thereof reduced in thickness, together with an insole comprising a rand portion to fit about the margins of the projection thus left upon the upper surface of the outer sole and an attached shank. It describes fully the first Sbicca patent even more fully than the patent itself.

It describes the old supplementary insole and outsole structure, and states that the insole-outsole were made separately, but does not otherwise describe how they were made.

The structure disclosed by the second patent in suit has an outsole with its elevated ball portion and its marginal groove or channel about this elevated portion, and a supplementary insole which is formed from the same blank from which the outsole is made by four separate steps, first a splitting operation from the heel portion toward the sole as far as a line indicated in Figs. 1, 3, 4, and 7, by the numeral 14. It then describes two cuts which are made about the ball portion of the sole, but does not state which cut is made first. It says that the rand is formed by a horizontal and inclined channel, cut 16 and 17, but does not state which cut is made first.

The meeting of the two cuts separates the rand from the sole blank.

The patent further states that the shank, notwithstanding the splitting operation, is still attached to the sole blank forwardly of the line 14, and that it is necessary to form a cut indicated at 18 to separate the insole from the outsole, and to permit the elevating of the insole from the outsole.

Fig. 4 illustrates the relation of the cuts around the points 14 and 18 and the condition of the leather better than any other view excepting possibly Fig. 7. The split throughout the shank portion extends to the line 14. Fig. 3 shows the channel 17 running across the end of the split and into the shank on both sides of the shoe. The horizontal cut from the edge of the sole into this channel would not reach the line of the cut 17 at the top, but would at the bottom, indicated in dotted lines in Fig. 3.

Fig. 4 shows that, in order to permit the separation of the insole from the outsole, the cross-cut 18 has to extend from the cut 17 at one side of the shoe, to the cut 17 at the other side of the shoe, and that it would leave at the point slightly to the rear of the cut 14 on the insole a loose tongue, which would be separated from the edges of the rand. The insole would have the form shown in Fig. 4.

In splitting the shank of the Sbicca patent, it is necessary to feed the blank a certain predetermined distance, then to set the splitting operation and back out the blank. It is not simply a continuing feed with a complete separation of the two.

The Sbicca patent does not give any explanation as to what agencies are to be used on the various operations, the four steps of making the sole, nor how they are to be carried on, except the formation of the split at the shank.

In Fig. 6 the horizontal cut 16 and the channeling cut 17 are illustrated. They have to meet at a blind spot inside the body or rand of the sole, and any variation in the angle of the knives might fail to make a clean juncture.

The outsole and the insole in the second Sbicca patent are of exactly the same size, and the vertical edges of the insole and outsole actually coincide. The patent states that the insole and outsole are exactly complementary, including the beveled portion.

Before the final cutting step is taken, the insole is left attached at the end of the split 14, the point of joinder of material of the split joint and the ball portion of the sole, as shown in Fig. 3, assuming that horizontal cut for separating the rand portion has been made as indicated by the line 17, and the dotted lines surrounding the line 17 indicating the width of the beveled portions about the island or elevated portion of the ball.

The following prior art was introduced by the defendant:

Patent No. 183,675, to Theophilus R. Hyde, for Improvement in Wooden-Soled Shoes, granted October 24, 1876, on an application filed September 2, 1876. This patent was not pleaded in the answer, and is introduced only to show the state of the art.

The patentee in his specification says: "This invention is designed to provide a cheap and comfortable shoe for the working-classes, who have at present very little knowledge of such a luxury." And describes his invention as follows: "This invention has relation to wood-soled shoes; and it consists, mainly, in the construction and novel arrangement of the sections of the sole, sawed from each other, and thereby exactly and economically fitted together; in the combination, with the insole and outer sole, of a yielding and water-proof intermediate sole, placed between the two; in the wooden welt-sole; and in the manner of sawing out, fitting and connecting the sections together and to the upper, as hereinafter fully shown and described."

The outer sole A is preferably made in two sections, B and C, sawed from each other, to secure an exact fit between their adjacent surfaces. The insole D is also sawed from the outer sole, to secure an exact adaptation in form to the upper surface thereof.

Patent No. 301,226, to Albert G. Gardner, for Inner Sole for Boots or Shoes, granted July 1, 1884, on an application filed April 30, 1884, shows a skeleton insole having a unitary shank and rand, the rand being referred to as a strip, with an opening centrally of the ball part of the insole, the opening being closed by a stay piece B, which is stitched or cemented to the insole about the edges of the opening.

In Figs. 3 and 4 the rand portion is shown as skived toward the opening.

Patent No. 429,480, to Frederick B. Robinson and William J. Morgan, for Insole, granted June 3, 1890, on an application filed September 13, 1889, shows the skeleton rand made in two pieces, with the shank piece attached to the skeleton insole by skiving and joining, which is a usual practice. It does not show an outsole. In Fig. 3 the rand is beveled at the edge of the opening therein.

Patent No. 1,569,823, to Fred Maccarone, for Shoe Structure, granted January 12, 1926, on an application filed August 5, 1925. The patentee in his specification says: "One of the principal objects of the present invention is to provide a shoe construction which while closely simulating in appearance when finished, a turned-sole shoe, is free from many of the objectionable features incident thereto."

After reciting what he considers objectionable features of what are known as "McKay" shoes, and turned-sole shoes, he says:

"In contradistinction to this, the present invention comprehends an inner integral shank and heel member and rand to which the upper is stitched and to which, in turn, the outsole is stitched, thereby rendering the shank rigid and immovable with respect to the upper and outsole.

"The invention furthermore comprehends a shoe structure of the character set forth which when finished presents no rough exposed stitching at the juncture of the upper with the sole as is present in shoes of the turned-sole type.

"The invention furthermore comprehends a shoe structure which while closely simulating shoes of the turned-sole type, entails a considerable economy both in labor and expense; which is highly efficient in its purpose, and comparatively simple in construction."

The main difference between the Maccarone shoe, which is of the "McKay" type, and other types of shoes, is said to be in the sole structure itself.

The Maccarone patent shows a skeleton insole in which the shank portion of the insole and the ball portion are a unitary structure. The forward or ball portion of the insole is cut out centrally, and the edge of the opening is skived so as to reduce it to a thin edge. The patent shows the skiving as having a beveled edge. The opening in the ball portion of the insole, Fig. 3, a bottom plan view of that insole, and the skived or reduced portion is about the opening 14.

The rear portion of the shank of the outsole is of reduced thickness. The leather is removed marginally about the ball portion of the outsole so as to form a channel about the central portion of the ball of the shoe, deep enough to receive the marginal portion of the insole, and the portion of the upper which is lapped upon the insole during the lasting operation.

The manner of lasting the shoe and of uniting the outsole with the insole was common and well known prior to the Maccarone patent.

The manner of forming the outsole leaves an elevated portion centrally of the ball of the foot, the edges of this elevated portion sloping out so as to conform with the contour of the skived inner edge of the insole. This permits a close fit between the two inclined surfaces, and also imparts to the edges of the insole high flexibility and very little thickness. Even if there is not a perfect fit, the edge of the opening or the rand portion of the insole will merge into the elevated portion of the insole and give a flush surface to the inside of the shoe, when the outsole is united with the insole. The Maccarone patent refers to the marginal portion of the insole as a rand, a term which apparently originated with Maccarone, but there is no material difference in the structure of the upper and the manufacturing methods in assembling the shoe from prior practice.

In Fig. 7 the skiving on the under side of the insole, to get the reduced edge, is indicated by the number 15, and the flush effect is also indicated in Fig. 7.

In Fig. 6 and Figs. 1 and 2, at 24, the metallic shank is shown, and also in cross-section in Fig. 5.

Exhibit F conforms to the showing of the Maccarone patent. It has the outsole with the elevated central portion or island, the sloping side of the island, rand portion with its skived inner edge about the opening, and shows the smooth flush surface of the inner part of the assembled shoe. It is a "McKay" stitched shoe.

Patent No. 1,593,264, to John A. Kelly, for Shoe, granted July 20, 1926, on

an application filed September 9, 1920. Fig. 1 of that patent discloses a half sole structure consisting of a stay A, having what is called a temporary insole B, which is secured thereto by a chain stitch, so that it may be readily removed after the two have been separated. The insole stops at the oblique line shown in Fig. 2, and meets the shank. The outsole F has a channel about the ball portion, the inner edge of which channel is perpendicular to the bottom of the channel, or what would be the top of the channel in the completed shoe, the channel being formed by cutting a strip of leather from the sole blank.

The strip is shown at A, in Figs. 1 and 5. The upper D is lasted to the stay A, and the edges are cut flush with the inside edge of the stay, so as to form a butt joint with the channel, instead of the skived joint and the flexible edge found in the patent to Maccarone, and the two Sbicca patents in suit.

Patent No. 1,600,019, to Charles B. Spalsbury, assignor to Johnson, Stephens & Shinkle Shoe Company, for Sole, granted September 14, 1926, on an application filed April 19, 1922, shows a sole structure in which the sole blank is split and the two parts are afterwards brought together and united so as to form a unitary sole structure.

Patent No. 1,728,366, to Anthony Ruggiero, for Shoe, granted September 17, 1929, on an application filed April 4, 1928, shows the complementary insole and outsole feature. The insole is cut from the outsole blank, after the edge of the blank has been channeled to give the desired difference in the sizes of the outsole and the insole. The insole of that patent has a champered edge, and the outsole at the ball has the elevated portion with the inclined edges. The shoe structure shown in that patent does not show a shank that is solid.

What Maccarone calls a rand Ruggiero calls a welt, and it extends about the ball portion of the sole and along the sides of the sole to the heel, and, as he states, if desired, it may be run around the heel.

In that patent there is used a separate shank shown in Fig. 6, with its stiffening shank, and a stay piece 5, in Fig. 7, to facilitate the lasting of the welt or rand.

Ruggiero cuts the insole or rand from the sole blank, and it is restored to its former position when assembling the shoe.

As shown in that patent, the upper edge of the upper is positioned between the outer edge of the rand and the outsole, and the inner edge of the rand is exposed following the lasting operation by the trimming of the upper. See Fig. 7.

Ruggiero shows clearly the condition in such shoes of the position of the edge of the upper between the rand, between the insole and the outsole, a condition which is compensated for by the deepening of the channel to afford space for additional width of material toward the outer edge of the rand. He also shows the flush condition of the edge of the inside of the sole due to the flexible edge of the rand and its meeting the inclined or beveled side walls of the island or elevated portion of the outsole.

Defendant also offered in defense the alleged prior use by C. P. Ford, in the manufacture of the Nouvelle shoe and the alleged prior use by Maccarone.

Maccarone utilized a skeleton insole, the forward portion of which was cut out to provide a very large recess bordered by a marginal strip of leather, skived or beveled entirely around the inside edge. He fully described what he contended was his invention in his patent No. 1,569,823.

Maccarone made his first shoe by hand in 1925, Exhibit F, and, having filed his patent application and been properly introduced, called at the plant of C. P. Ford & Co., shoe manufacturers of Rochester, N. Y., around May, 1926, and talked with the superintendent, Mr. White. Mr. White called in William Fennessy, the foreman in the Ford leather department, expressed his desire to make that shoe, and told Fennessy to look over the shoe and co-operate with Maccarone.

That shoe was described by Fennessy as having an insole, the forward portion or forepart taken out, with a neat bevel reaching from the ball clear down, and it was also provided that the island was located where the wear and tear of the shoe occurred, and that was very important, because the more leather provided at that point, the longer the wear of the shoe.

Fennessy said he had never seen a shoe of that type before, and he thought

the Maccarone shoe was a very well-made job, and that he noticed particularly the flexibility of it in the forepart around the island, and that the inside of the shoe was flat and smooth. The unit of measurement of the thickness of leather is an iron which is .02 of an inch. They commenced to make the shoes upon the machinery which Ford then had in its plant. They started with one case (thirty-six pairs) of shoes, having a two and one-half iron insole, and the rand characteristic of the Maccarone shoes.

The outsole was reduced from the ball line down by the use of a pad or template, and the sole was then reduced around the forward end on an Apex machine, in order to produce the beveled island. The knife in the Ford plant not proving suitable, Maccarone had it doctored so that it would remove the edge from the outsole and produce the desired bevel corresponding to the insole bevel.

After the completion of the thirty-six pairs, the Ford Company went into commercial production of Maccarone's shoes, under the name Nouvelle, in 1926, subsequent to the arrangement of the license agreement (Exhibit 6) which was executed on May 4, 1926.

Maccarone went into the employ of the Ford Company for the period of six months, for the purpose of installing his system in its plant.

Under the agreement the Ford Company was to pay a royalty, and it actually made something over 350,000 pairs of the so-called Maccarone shoes. The production of these shoes in the Ford factory was a day by day operation, from 1926 to 1932. During the first four years the shoes were stitched, and during the last two years they were cemented.

Exhibits E 1 to E 7, both inclusive, demonstrate the successive steps in making the shoes, which were as follows: He first took an insole blank (E 1) and formed the rand therein by cutting out the center of the insole, skiving down the edge to form a bevel entirely around the edge of the opening, producing the skeleton insole (E 2). He then took a sole (E 6), and by the use of a template (E 3) he reduced the heel and the shank of the sole (E 6) on a Summitt splitting machine. The piece of material removed had the form of the template (E 3), and left the heel and shank portion of the sole thinner than the forward ball portion of the shoe. He then formed the bevel on the sole, and this was done with an Apex machine and the specially reshaped knife. The insole was then lasted, the upper applied thereto, and the outsole then applied over the insole and upper. The beveled opening in the insole and the beveled island of the outsole fitted together, so that the inner surface of the shoe was flush when it was finished. The two bevels in the center met and made the inside of the shoe smooth and flush.

The Ford Company commenced making cemented shoes about October, 1930, a written order for cemented shoes dated November 14, 1930, which shoes were shipped December 30, 1930, having been produced.

The earliest written record of the making of cemented shoes, by Maccarone, was a letter to him from the United States Shoe Company, of Cincinnati, Ohio, dated September 13, 1929 (Exhibit M), and the covering letter from Maccarone to United States Shoe Company, sent at the time the insoles and outsoles were shipped, dated December 28, 1929.

Fennessy stated that he cut insoles from outsoles in his work at the Ford plant, in 1926, and explains how it was done.

Linden, a witness called by the plaintiff, also testified that in 1920 he cut an insole from an outsole, produced illustrative specimens (Exhibits 30 A, 30 B, and 30 C), and, in addition to repeating the same statement on cross-examination, elaborated it by saying, "I did not think it was anything wonderful myself."

From a consideration of the prior art patents and the prior use of the Ford Company and Maccarone, it seems clear to me that plaintiff does not in any of the claims in suit, of either of the patents in suit, disclose any invention.

All of the shoes of plaintiff's licensees and Maccarone's licensees utilize the rand and island outsole with their corresponding bevels, used by the Ford Company and Maccarone, and described in his patent.

All that I can find disclosed by Sbicca in both of his patents in suit are certain knife cuts which were to be made in order to separate one section of leather from another.

This clearly appears from a consideration of the claim in suit, claim 2 of patent No. 1,838,708, the first patent in suit:

"2. The method of constructing a cemented shoe consisting in providing a sole of the desired final sole thickness in the finished shoe,

removing from the edges of the upper surface of the ball section and adjacent portions of the shank section of the sole a rand of less thickness than the sole and

reducing the thickness of the shank and heel portions of the sole, by removal of material from the upper surface thereof, to the thickness of the marginal portions of the ball section thereof,

lasting an upper upon a last to which said rand and a shank piece to which the rand is secured have been applied, and

permanently securing the upper to the rand and the edges of the shank piece, and

permanently attaching the sole to the upper, the rand, and the shank without delasting the shoe."

This also clearly appears from a consideration of the claims in suit of patent No. 1,902,725, the second patent in suit:

"1. The method of producing complementary insole-outsole combinations comprising the following steps,

providing a leather sole blank of the desired thickness of the outsole and having a grain and a flesh side,

splitting the heel and shank portions of the sole blank to form insole and outsole shank pieces,

removing a rand from the margin of the ball section of the flesh side of the sole while leaving the same attached to the forward end of the insole shank piece, and

splitting the sole between the shank and ball sections by a cut extending inwardly from the flesh side thereof to the depth of the desired insole and between the rand terminals."

Claim 2 is substantially like claim 1, excepting that the last step reads: "Cutting inwardly from the flesh side of the sole blank to a depth equal to the thickness of the desired insole and on a transverse line extending from terminal to terminal of the rand."

Claim 3 is likewise substantially like claim 1, excepting the last step reads: "Forming a cut extending transversely from terminal to terminal of the rand and inwardly from the flesh side of the blank to the forward end of the split severing the heel and shank portions of the blank."

The fourth claim is directed to the product obtained by this process.

The utilization of a knife to remove from the blank of leather certain parts thereof was a common expedient, and the steps by which plaintiff accomplished it were well known.

The art long prior to Sbicca shows that the insole or welt is cut out by a series of cuts which appear to be so obvious that no particular claim is laid to the mechanical procedure.

The most that can be said with reference to the patents in suit, if that can be said, is that they carry forward the same idea set forth in earlier patents relating to the same art or use earlier knowledge to produce substantially the same type of product.

A higher order of invention is required. Berlin Mills Co. v. Procter & Gamble Co., 254 U. S. 156, 41 S. Ct. 75, 65 L. Ed. 196; Corona Co. v. Dovan Corp., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610; Minerals Separation Corp. v. Magma Co., 280 U. S. 400, 50 S. Ct. 185, 74 L. Ed. 511; Powers-Kennedy Corp. v. Concrete Co., 282 U. S. 175, 51 S. Ct. 95, 75 L. Ed. 278; Saranac Mach. Corp. v. Wirebounds Co., 282 U. S. 704, 51 S. Ct. 232, 75 L. Ed. 634; American Fruit Growers v. Brogdex, 283 U. S. 1, 51 S. Ct. 328, 75 L. Ed. 801; Smith v. Springdale Park, 283 U. S. 121, 51 S. Ct. 368, 75 L. Ed. 878; Permutit Co. v. Graver Corp., 284 U. S. 52, 52 S. Ct. 53, 76 L. Ed. 163; Electric Cable Co. v. Brooklyn Edison Co., 292 U. S. 69, 54 S. Ct. 586, 78 L. Ed. 1131.

Plaintiff contends that commercial success must be given some consideration in considering the patents in suit.

Commercial success, if shown, is an unsafe guide, and, in the case of the patents in suit, I am convinced that what I consider a limited success was not achieved by anything that was taught by Sbicca, but what had been taught by the prior art.

There is no evidence from which I can find that the patents in suit contributed anything to the sale of the shoes, and without that commercial success is not a factor. Meinecke & Co. v. Lisk

Mfg. Co. (D. C.) 274 F. 747; Harvey Hubbell, Inc., v. General Electric Co. (C. C. A.) 267 F. 564.

Sbicca solved no problem; in fact, his many cuts are not generally practiced; on the contrary, it is generally done by a continuous operation.

The evidence to sustain the prior use by Maccarone and the Ford Company is sufficient, and I do not find it necessary to go into a detailed consideration of it. Corona Co. v. Dovan Corp., supra; National Casket Co. v. Stolts (C. C. A.) 157 F. 392; Crone v. John J. Gibson Co. (C. C. A.) 247 F. 503; Kaser Process Pie Co. v. Pie Bakeries of America (D. C.) 50 F.(2d) 414; James Clark, Jr., Electric Co. v. United States E. T. Co. (C. C. A.) 245 F. 753.

I have refrained from considering the question of infringement, as the claims in suit of each and both of the patents are clearly invalid.

A decree may be entered in favor of the defendant dismissing the complaint on the merits, with costs. Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by Rule 70½ of the Equity Rules (28 USCA following section 723) and Rule 11 of the Equity Rules of this court.