**SBICCA--DEL MAC, Inc., et al. v. MILIUS SHOE CO.**

No. 12774.

Circuit Court of Appeals, Eighth Circuit.

Nov. 18, 1944.

George T. Bean and Theodore S. Kenyon, both of New York City (Delos G. Haynes, of St. Louis, Mo., and Frederick Bachman, of New York City, on the brief), for appellants.

John H. Cassidy, of St. Louis, Mo. (Joseph J. Gravely and J. Sydney Salkey, both of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, THOMAS, and RIDDICK, Circuit Judges.

THOMAS, Circuit Judge.

This is an appeal by the plaintiffs from a decree for the defendant in a suit involving the alleged use by the defendant of the inventions set forth in two patents owned by the plaintiffs: Sbicca reissue patent No. 20,274 and Maccarone patent No. 1,988,281. The controversy involves claims 1, 2, 3, 4, 9, 10, and 13 of the Sbicca patent and claims 3 and 5 of the Maccarone patent. Claims 9 and 10 of Sbicca are for a complementary insole-outsole combination shoe, and claims 1, 2, 3, 4, and 13 are for a method of making the shoe. Claims 3 and 5 of the Maccarone patent are both for a method of making the Sbicca shoe. The patents relate particularly to the art of making women's shoes.

The complaint is in three counts. The first count or cause of action is for infringement and asks for an injunction and an accounting for profits and for damages. The defenses are (1) invalidity, (2) noninfringement, and (3) unclean hands. The second cause of action is for judgment for royalties and interest under a license agreement dated May 1, 1933. The defenses are (1) nonuse, (2) ouster, and (3) waiver. The third cause of action is for judgment for royalties based upon a license agreement dated September 1, 1937. The defenses are (1) nonuse, (2) a special agreement, and (3) unclean hands.

The District Court held all the claims in issue in both the Sbicca reissue patent No. 20,274 and the Maccarone patent No. 1,988,281 invalid "because of lack of invention in view of the prior art." In finding the patents invalid the court cited Harmer (Australian) 4066/17; Maccarone 1,569,823; Kelly 1,593,264; and Ruggiero 1,728,366. Any minor differences that may exist, the court found, "are only in matter of form or degree and lie well within the skill of an expert shoemaker." In addition to these examples of the prior art the defendant in its brief cites Lentz No. 307,780 (Nov. 11, 1884); Nevins No. 459,166 (Sept. 8, 1891); Scott No. 462,594 (Nov. 3, 1891); and Scott No. 467,441 (Jan. 19, 1892); and, as particularly applicable to Maccarone, French No. 344,659; Beach 488,303 (1892); Engel 1,068,489 (1913) and 1,313,887 (1919); and Caggiano 1,904,405 (1933).

Plaintiffs contend that the court's findings are clearly erroneous in that they are not supported by substantial evidence, are contrary to the weight of the evidence, and are the result of an erroneous view of the law.

The manufacturing of shoes has been a progressive art. Advance has been marked by improved methods of shoemaking and by improved machinery for use in cutting,

forming and shaping leather, and for other purposes. The patents in issue are improvement patents.

Formerly most shoes were made with two soles, an outsole and an insole. Shoes so made were heavy, stiff, and uncomfortable to wear. Shoemakers came to realize that there was a demand for shoes light in weight, durable in quality and, especially since high heels came into fashion, having soles flexible at the juncture of the instep or shank and the ball line. In addition to these qualities manufacturers were interested in the difficulties and costs of manufacturing, and in the sale price.

The first shoe that seemed to embody many of the qualities desired by the users is known as the turn shoe. This was a single sole shoe in which the upper was sewed directly to the sole. To·produce a smooth surface for the foot there was a channel around the top margin·of the sole to receive the "lasting allowance" of the upper and a slit to bury the seam. This type of shoe was difficult to make. In the course of manufacture it was necessary to turn the shoe inside out; and uniformity in size was frequently lacking. These and other difficulties presented the problem to the solution of which the patents in issue have contributed.

Sbicca and Maccarone solved the prob-

lems and overcame the difficulties and disadvantages of the older methods by splitting a single sole blank and using the flesh side for an insole and the other side of the leather for the outsole. By first attaching the upper of the shoe over a last to the insole and afterward adding the outsole the necessity for turning the shoe inside out in the course of manufacture was obviated; and by leaving, in the splitting·process, the full thickness of the outsole at the ball, the point of greatest wear, durability is achieved. By this means lightness, uniformity and flexibility, as well as durability, labor saving .and cost of manufacturing, were accomplished.

The Sbicca patent, No. 20,274, is a reissue of original No. 1,902,725, issued March 21, 1933. Claims 9 and 10 of the reissue patent are for a composite sole, that is, an article or product patent, and claims 1, 2, 3, 4, and 13 are for a method of producing such a sole. Claims 9 and 13 are representative. They are set out in the footnote.[1]

The Maccarone patent, No. 1,988,281, issued January 15, 1935, is a method patent for cutting the complementary outsoles and insoles described in the Sbicca patent from a single blank. Claim 3 of the patent, set out in the footnote,[2] is illustrative.

It will be observed that in the Sbicca pat-

---

[1] "9. In a shoe, a composite sole having an insole section and an outsole section, said insole section having an inclined cut extending from one face to the other thereof and running along the junction of the ball line and the shank portion from a point on one side spaced from one edge to a point on the other side spaced from the other edge, a rand on said insole section and extending around the ball section of the sole and terminating at opposite sides of said cut, said rand defining with said cut an opening having internally bevelled edges, a shank and heel portion integral with said rand, said outsole section being complementary to said insole section and having· a reduced marginal edge at the forepart to receive the said rand and having a raised portion which registers with the said opening, the top of said raised portion lying substantially flush with the top surface of said rand in the assembled shoe, said insole and outsole sections respectively comprising the flesh and grain sides of·a single piece of sole leather."

"13. The method of preparing a complementary insole-outsole combination which comprises providing a sole leather blank, splitting the blank from the heel section forwardly to approximately the junction of the ball line and the shank portion to provide an insole shank piece, making a forwardly inclined transverse cut extending from the forward end of the split to the flesh side of the blank and terminating at points spaced laterally from the edge of the blank, and cutting a rand from the marginal edge of the flesh side of the blank while leaving the rand attached to ˙said shank piece."

[2] "3. In shoe making methods, that improvement which includes: providing a full rounded sole blank from suitable material; temporarily depressing the blank over a central area of the ball portion thereof; then, while the blank is thus depressed, continuously splitting the blank above the depressed area to remove therefrom a full insole having an opening therein defining a continuous marginal rand, said rand extending from the front of one side of the shank around the toe to the front of the opposite side of the shank and affording means for affixing an upper to the in-

ent the operation of splitting the blank consists of three or four steps, while in the Maccarone patent the same result is accomplished in two steps. Neither patent covers the tool to be used in performing the splitting process. However, it appears that Sbicca contemplated the use of a knife held in the hand of the artisan or shoemaker, and Maccarone provides that the blank, after depressing an area at the ball, shall be passed between the rollers of a conventional leather splitting machine in which the splitting blade is positioned to cut above the bottom of the depressed area.

Harmer No. 4066/17 (Australian), referred to by the court, conceived the idea of cutting (in the language of the art, skiving) away a portion of both an outsole and an insole, providing an opening or aperture in the insole at the ball in front of the shank to receive a similarly shaped surface, not skived away, of the outsole, with a space above to be filled with cork or soft leather. That part of the two soles skived away was waste. Harmer's patent did not meet with success and the method disclosed by him did not come into use. The patent, however, suggests a complementary outsole-insole shoe in which a projecting surface of the outsole through an opening in the insole is called an island, the surrounding remains of the insole a rand, and the insole a skeleton insole.

Maccarone in his first patent, No. 1,569,-823 (1926), for the purpose of eliminating the necessity of turning the shoe, described a method almost identical with the Harmer patent. He used two sole blanks and skived them to produce a skeleton insole from one blank and a complementary outsole from another. He achieved lightness and flexibility, and avoided turning the shoe in the process of manufacture. But there was great waste, and the method was not adopted by himself or other manufacturers. In the same year, 1926, Kelly described a method for making a single sole shoe without turning it by using a thin narrow strip of material instead of an inner sole to serve as a binder between the upper and the single sole. In 1929 Ruggiero accomplished what Kelly had done and in substantially the same way by cutting the narrow strip, called by him a welt, from the margin of the single sole, and by attaching the upper first to the welt and then cementing the sole over the welt and the exposed part of the upper. The welt was held in place on the last by an anchor piece of fabric during the process of constructing the shoe. The method of cutting the welt is not described, "this part of the procedure", he says, "being a mechanical detail which forms no part of the invention."

The Lentz, Nevins and Scott patents comprise leather cutting and splitting machines which, it is claimed, by minor variations and adaptation requiring only mechanical skill, can be made to split a sole blank according to the specifications of the Maccarone patent. They are early patents covering the period from 1884 to 1892. They are machine or tool patents, and the District Court does not refer to them in its findings. The Beach, Engel and Caggiano patents are cited as examples of machines for skiving leather and by use of templates or "pattern pieces" producing layers for heels and other parts of the shoe of different forms and thickness.

Comparison with the prior art makes clear the fact that Sbicca and Maccarone did not discover the art of splitting leather nor did they discover the advantages of the skeleton insole and its complementary outsole. Splitting machines were old in the art and Harmer revealed the skeleton insole with a complementary outsole. Kelly and Ruggiero taught a method of making a single sole shoe without turning the shoe inside out during the process of manufacture. And the use of the die and matrix together with templates in splitting leather in varying forms and of uneven thickness was in practice prior to 1931.

When the state of the prior art is given full consideration, however, it can not be denied that the contribution made by Sbicca and Maccarone, although consisting of a combination of old elements, was new and useful. They were the first to conceive the idea of producing a skeleton insole and a complementary outsole by splitting a sole blank from heel to toe in a simple and practical way without waste of material and with economy of labor. The concept included not only a new method of manufacture but also a composite outsole-insole which could be produced from a single sole blank.

In determining the validity of the patents, therefore, the question presented is whether these advances constitute in-

---

sole, and the remaining part of said blank comprising an outsole unreduced in thickness over an area complemental to the opening in the insole."

vention within the meaning of 35 U.S.C.A. § 31. The statute provides that "Any person who has invented or discovered any new and useful art, machine, manufacture * * * or any new and useful improvements thereof * * * not known or used by others * * * may * * * obtain a patent therefor." We think the Sbicca and Maccarone patents disclose a new and useful contribution to the art of shoemaking. The patents are not valid, however, unless they reveal invention or discovery. Not every new and useful improvement in an art is patentable. Since 1850 the courts have said that such an improvement requires the application of "more ingenuity and skill" than that of "an ordinary mechanic acquainted with the business." Hotchkiss v. Greenwood, 52 U. S. 248, 266, 267, 11 How. 248, 13 L.Ed. 683. Whether the improvement "relied upon in a particular case is anything more than ordinary mechanical skill is a question which cannot be answered by applying the test of any general definition." McClain v. Ortmayer, 141 U.S. 419, 427, 12 S.Ct. 76, 78, 35 L.Ed. 800.

It is argued that the standard of originality and skill stated in the Hotchkiss case, supra, has been raised by recent decisions of the courts. In Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. 58, the Supreme Court said that a "new device, however useful it may be, must reveal the flash of creative genius not merely the skill of the calling. If it fails, it has not established its right to a private grant on the public domain." In Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 636, a case involving a patent for a lubricating and cooling system for "radial" air-cooled combustion engines, Judge Learned Hand, speaking negatively, said: "Unless we are to mistake for invention the slow but inevitable progress of an industry through trial and error, and confer a monopoly merely upon the exercise of persistent and intelligent search for improvement", there is no invention. Judge Lenroot of the Court of Customs and Patent Appeals, having considered these and other cases in Re Shortell, Cust. & Pat.App., 142 F.2d 292, 295, concluded that all that is intended by these judicial statements is that "the thing patented must involve more than the skill of the art to which it relates." It is not believed that they were intended to be amendments to the law.

The rule of the Hotchkiss case, supra, was apparently intended to clarify the law as it existed prior to that time. Before 1850 Chief Justice Tindall of England had said that "if the invention be new and useful to the public, it is not material whether it be the result of long experiments and profound research, or whether by some sudden and lucky thought or mere accidental means." Crane v. Price, 1 Webs. Pat.Cas. 411. Chancellor Kent had said (2 Kent, Com. 371): "The law has no regard to the process of the mind by which the invention was accomplished, whether the discovery be by accident or by sudden or by long and laborious thought." And Mr. Justice Story had said, "It is of no consequence, whether the thing" be discovered "by accident, or by long, laborious thought, or by an instantaneous flash of mind." Earle v. Sawyer, Fed.Cas.No.4247, 4 Mason 1, 6.

In invention what constitutes the "flash of genius", that is, "more" than the "skill of an ordinary mechanic acquainted with the business", must still be determined without the aid of any statutory or judicial definition in each particular case, and sometimes by judges without ordinary skill in the particular art.

Under the circumstances present in this case the rule has often proved helpful and has frequently been applied that "the man who has taken the final step which has turned a failure into success" is entitled to a patent; that "it is the last step that wins"; and that where a series of inventors are groping to attain a certain result, the last one who grasps the idea which renders the article or method useful and effective is entitled to a patent—that his thought constitutes invention. Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co. (The Barbed Wire Patent), 143 U.S. 275, 283, 12 S.Ct. 443, 36 L.Ed. 154; Consolidated Safety-Valve Co. v. Crosby Steam Gauge & Valve Co., 113 U.S. 157, 159, 5 S.Ct. 513, 28 L.Ed. 939; Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U.S. 704, 709, 51 S.Ct. 232, 75 L.Ed. 634; Smith v. Snow, 294 U.S. 1, 14, 55 S.Ct. 279, 79 L. Ed. 721; Montgomery Ward & Co. v. Clair, 8 Cir., 123 F.2d 878, 881, and cases cited. We have heretofore applied the rule stated by the Supreme Court in Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 656, 53 L.Ed. 1034, to determine whether a given improvement is a result of the skill of the art or of the creative faculty

amounting to invention. The Court there said: "It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. * * * It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent." In the present case the prior art discloses that the problem involved here had existed as early at least as 1917 when Harmer attempted to solve it. Thereafter the record shows that many skilled shoemakers endeavored for many years prior to Sbicca's contribution to solve the problem and had failed.

■ The history of patent law shows that not all improvements discovered by workers in an art must be denied a patent. Most advances and improvements are discovered by the persistent efforts of those skilled in the arts to which they belong. The "flash of thought", which is inventive genius, does not often occur to one who is not skilled in the particular art to which the invention belongs. Necessity is still the mother of invention and the thought of a new and improved combination or method usually flashes first in the mind of one who realizes the problem and searches for a solution. With these things in mind, and considering the novelty, the utility and the commercial success of Sbicca and Maccarone's inventions, we are inclined to hold both patents involved valid. Were the question of invention doubtful commercial success and need in the industry may be considered as evidence thereof. DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 665, 51 S.Ct. 563, 75 L.Ed. 1339; Simplex Paper Box Corp. v. Rosenthal Paper Co., 8 Cir., 104 F.2d 349, 353. Here the record shows that no skeleton insole shoes were on the market prior to the adoption of the Sbicca process. When the defendant began the manufacture of shoes under its first license in 1933 it advertised the Sbicca Method as "probably the most perfect construction of fine shoes ever developed"; and within ten years thereafter the annual production of shoes by that method rose to approximately 20,000,000 pairs.

■ But Sbicca's original patent No. 1,-902,725, dated March 31, 1933, of which No. 20,274, dated February 16, 1937, is a reissue, was held invalid in view of the prior art by Judge Campbell of the Eastern District of New York in Sbicca-Method Shoes v. M. Wolf & Sons, 11 F.Supp. 239, affirmed by the Second Circuit Court of Appeals without an opinion April 20, 1936, 82 F.2d 1015; and the defendant argues that we should follow that decision. While we have great respect for the decision of Judge Campbell, that decision is of course not binding upon us as a case of stare decisis; and comity is not applicable to the situation presented. Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949. The force of that opinion as a precedent is weakened by the fact that the record in that case including the testimony and the references to the prior art was before the Patent Office when the application for reissue was pending there. Having considered the whole matter, the Board of Appeals in the Patent Office found the claims in issue valid. In reference to the article claims and the method claims the Board said, "there is really only one conception involved and the difference in form of the claims in this case would be mere technicality." The patent is for making a shoe with a composite sole consisting of a skeleton insole and a complementary outsole made by splitting a blank in a particular form.

■ It is argued, also, that invention is a fact and that the finding of the trial court that the patents are invalid is conclusive on this court, unless such findings are "clearly erroneous" within the meaning of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The trial court found the claims in issue of both patents invalid in view of the prior art. This conclusion seems to be based upon the finding that "Any slight or imagined differences are of immaterial detail not affecting the substance of the alleged invention." The findings state no more particular basis for the conclusion. In fact the trial court made no circumstantial findings of fact. This makes it necessary for this court to examine all the evidence. A finding of fact of a District Court is not clearly erroneous unless it is (1) unsupported by substantial evidence, (2) contrary to the clear

396

weight of the evidence, or (3) induced by an erroneous view of the law. Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Sears, Roebuck & Co. v. Talge, 8 Cir., 140 F.2d 395, 396. The evidence, including the patents and the exhibits, is all before the court in this case, and there is no substantial dispute in reference to the facts. In United States v. Esnault-Pelterie, 303 U.S. 26, 30, 58 S.Ct. 412, 414, 82 L.Ed. 625, the Supreme Court said: "* * * where, with all the evidence before the court, it appears that no substantial dispute of fact is presented, and that the case may be determined by a mere comparison of structures and extrinsic evidence is not needed for purposes of explanation, or evaluation of prior art, or to resolve questions of the application of descriptions to subject-matter, the questions of invention and infringement may be determined as questions of law." See also same case, 299 U.S. 201, 57 S.Ct. 159, 81 L.Ed. 123, and Galland-Henning Mfg. Co. v. Logemann Bros. Co., 7 Cir., 142 F.2d 700. This rule is applicable here. The trial court in this case was so obviously impressed with the undisputed character of the evidence that only ultimate facts were found. We think the inferential finding of the trial court is not supported by substantial evidence and is contrary to law.

Again, the defendant argues and the court found that the Sbicca Reissue patent No. 20,274 is invalid for failure to comply with the reissue statute (35 U.S.C.A. § 64). This statute provides that "Whenever any patent is wholly or partly inoperative or invalid, by reason of a defective or insufficient specification, * * * if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall * * * cause a patent for the same invention, and in accordance with the corrected specification, to be reissued to the patentee * * * for the unexpired part of the term of the original patent."

 The file wrapper covering the reissue proceeding in the Patent Office is voluminous. We have read the entire record and find that the facts support the grant of the reissue patent. The findings of the trial court upon this issue are contrary to the evidence. The undisputed affidavits of Sbicca show mistakes, errors and omissions in the original patent and that such errors were inadvertent and acci-

dental. The reissue statute is to be liberally construed and where, as here, there is evidence to support the findings of the Commissioner in respect of inadvertence, accident or mistake his decision is binding on the court. Freeman v. Altvater, 8 Cir., 138 F.2d 854, 859. A review of the evidence and of the reissue proceedings before the Commissioner would unnecessarily extend this opinion. We think it can not be said that he erred in granting the patent.

 The defense of infringement requires a comparison of Sbicca and Maccarone patents with the accused practices of the defendant. "Not only is the burden to make good this defense [infringement] upon the party setting it up, but his burden is a heavy one, as it has been held that 'every reasonable doubt should be resolved against him.'" Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983; Radio Corp. v. Radio Engineering Laboratories, 293 U.S. 1, 8, 55 S.Ct. 928, 79 L.Ed. 163; Donner v. Sheer Pharmacal Corp., 8 Cir., 64 F.2d 217, 221, and cases cited. The gist of the Sbicca patent which differentiates it from the prior art is the splitting of a single blank of sole leather in a particular way to produce an insole and an outsole of a described form, light and flexible, and without waste. Sbicca performed the operation with a knife held in the hand in three or four cuts, the point of beginning being immaterial, Maccarone improved the method of doing the same thing by first pressing down the ball of the blank by means of a die and a matrix and then severing the insole from the outsole by running the blank between the rollers of a conventional splitting machine. The defendant splits the sole blank with the same result on a splitting machine invented by Card, patent No. 2,088,051, issued July 27, 1937, application dated October 19, 1934. This machine differs in substance from the conventional splitting machine used by Maccarone only in that a die and a matrix for pressing down the ball portion of the blank out of the plane of the splitting knife are built into the opposing faces of the rollers. The result of the splitting operation is practically the same under the three patents. All produce the Sbicca split sole with the outsole having the full thickness of the blank at the ball and the insole being complementary thereto. It is not disputed that the Maccarone and the Card devices were

decided improvements over Sbicca's method of splitting the blank, in that they each accelerated the splitting operation and resulted in greater uniformity in the insole and the outsole. But they are improvements only upon Sbicca's basic method.

The trial court found, and the defendant argues, that the defendant's shoe and method do not infringe the Sbicca and Maccarone patents because they do not include the three or four step process of the Sbicca patent nor the two step process of the Maccarone patent. This is a plausible but an unreal distinction based upon the difference between splitting the sole blank wholly by use of a knife held in the hand and by performing the same thing by means of a knife fixed in a machine. In splitting a sole blank with a knife Sbicca starts at the heel and proceeds in step one to the junction of the ball and shank. In step two he may move forward around the margin of the blank severing the rand, and in step three he may sever the rand from the shank; the order of the steps is not material. But in the three steps, or three slices, he splits the insole from the outsole by splitting the blank from heel to toe. The defendant performs all three operations in one continuous movement without stopping at the points at which Sbicca terminated one stroke of the knife and began another. Defendant in reality steps from the heel to the toe just as Sbicca does, but, without halting at the end of each step. Omission of a single step would result in failure completely to sever the insole from the outsole. Defendant simply uses a better tool than Sbicca did.

 Neither Sbicca nor Maccarone claims a patent upon the tools with which the sole blank is split. But that fact is not material because "A process and an apparatus by which it is performed are distinct things. They may be found in one patent; they may be made the subject of different patents." Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 318, 29 S.Ct. 495, 500, 53 L.Ed. 805. Moreover, the validity of a process or method patent does not depend upon whether the operation must be performed by hand or may be more expeditiously performed by a machine. Its essence is unchanged without regard to any variation which takes place in the instruments used "as long as the acts of which it is composed are properly performed." Expanded Metal Co. v. Bradford, 214 U.S. 366, 383, 29 S.Ct. 652,

656, 53 L.Ed. 1034. If infringement could be avoided by using a machine instead of a hand tool a method patent would be of little value.

 It seems clear also that the defendant's method infringes the Maccarone patent. The two steps taken by Maccarone are described thus in claim 3: "In shoe making methods, that improvement which includes: providing a full rounded sole blank from suitable material; [1] temporarily depressing the blank over a central area of the ball thereof; [2] then, while the blank is thus depressed, continuously splitting the blank above the depressed area to remove therefrom a full insole having an opening therein defining a continuous marginal rand, said rand extending from the front of one side of the shank around the toe to the front of the opposite side of the shank * * *, and the remaining part of said blank comprising an outsole unreduced in thickness over an area complemental to the opening in the insole." This describes exactly what the defendant does and the results are identical. The difference is not in the operation nor in the steps but only in the apparatus to accomplish the result. It has long been settled that infringement of a method can not be avoided by merely varying the details of the apparatus made use of. Smith v. Snow, 294 U.S. 1, 20, 55 S.Ct. 279, 79 L.Ed. 721; Tilghman v. Proctor, 102 U.S. 707, 730, 731, 26 L.Ed. 279; Cochrane v. Deener, 94 U.S. 780, 788, 24 L.Ed. 139; Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 139 F.2d 633, 643; Walker on Patents, III Deller Ed., p. 1730, § 493.

The defendant argues that its method of splitting the sole blank differs from Sbicca and Maccarone methods and, therefore, does not infringe, in that on the Card machine the splitting is so uniform that the sole portions may be interchanged with others of the same size and style. This is no doubt an advantage in quantity production, but it is not due to any difference in method; it depends only upon the care and accuracy used in the operation. It is an advantage which inheres in the Maccarone method as well as in the defendant's method.

The third defense to the first cause of action is based upon the alleged equitable ground that the plaintiffs come into court with unclean hands. In connection with this defense the trial court found that

"Plaintiffs formed a pool of substantially all the patents relating to skeleton insole shoes, including the group of patents and applications theretofore owned or controlled by the Kelly interests, and a patent and an application owned or controlled by Compo Shoe Machinery Corporation and entered into an agreement whereby they would license these patents to the shoe industry. The original patents of three reissued patents in the pool have been held invalid for want of invention by the Circuit Court of Appeals for the Second Circuit. In Sbicca-Method Shoes v. M. Wolf & Sons, D.C., 11 F.Supp. 239, affirmed, 2 Cir., 82 F.2d 1015, the original patent of Re. 20,274, being No. 1,902,725, was held invalid."

The defendant's argument based upon this finding is (1) that the pool of substantially all the patents relating to skeleton insole shoes was in essence a combination in restraint of trade and (2) that the pooling contract amounted to the use of the patents to secure a monopoly not granted by the Patent Office and contrary to public policy.

The plaintiffs say (1) that the finding that the plaintiffs formed a pool of substantially all the patents relating to skeleton insole shoes is not founded in fact nor supported by any evidence in the record, and (2) admitting that a pool of patents held by the three interested parties was formed, such pooling contract was for purely legitimate purposes and for the protection and benefit of the licensees and the public.

An understanding of these contentions calls for a brief historical summary of the licenses and agreements involved. On May 1, 1933, Sbicca-Method Shoes, Inc., granted a license to the defendant to use Sbicca patent No. 1,838,708, patented December 29, 1931, and any pending application for refinements or improvements thereof, until December 29, 1948, for a royalty of 2½ cents for each pair of shoes manufactured under the license. At that time Sbicca had pending in the Patent Office an application which eventuated in patent No. 1,902,725, March 21, 1933. These two patents were the originals of reissue patent No. 20,274.

The Compo Shoe Machinery Corporation (hereinafter called Compo) was in 1933 and thereafter engaged in manufacturing shoemaking machinery, and it was the assignee of the Ruggiero patent, supra. Compo was producing and selling or leasing to shoe manufacturers a leather splitting machine made under the Card patent, supra. After 1933, Compo, Sbicca-Method Shoes, Inc., assignee of the Sbicca patents, Maccarone, and other of the plaintiffs as competitors were involved in litigation. For the purpose of settling all disputes among them three contracts were entered into on August 3, 1937. Two of the contracts providing for certain assignments on the conditions named therein were placed in escrow for a limited time for the performance of the conditions. The contract controlling the terms of settlement and the method of doing business thereafter became effective. It provided that all the parties should make Sbicca-Del Mac, Inc., a new corporation, exclusive licensee with the exclusive right to grant licenses to shoe manufacturers and, also, to sue for unpaid royalties under licenses previously granted and to sue for infringement of any of the patents. A schedule of the patents, including patents for shoemaking methods and patents for machinery, was attached to the contract. There were 17 of such patents in the list including the patents in issue. The pertinent features of the contract are (1) that the parties and Sbicca-Del Mac, Inc., severally released Compo from all liability for patent infringement arising prior to August 3, 1937; (2) that Sbicca-Del Mac, Inc., should grant licenses on a prescribed form throughout the life of each patent to all responsible shoe manufacturers in the United States and Canada requesting the same, including the users of Compo machinery, on the basis of a royalty of one cent for each pair of shoes made by the licensee after September 1, 1937; (3) Compo agreed not to sell machinery for use in making shoes under any of the patents, except to licensees, conditioned upon like conduct of other manufacturers, thereby avoiding contributory infringement; and (4) the owners of the patents agreed that they would not discriminate against Compo.

Thereafter, as of September 1, 1937, Sbicca-Del Mac, Inc., granted the defendant a license pursuant to the form of agreement attached to the contract of August 3, 1937, supra, authorizing the defendant "to utilize the inventions covered" by the list of 17 United States and Canadian patents controlled by the licensor and set out at the end of the license agreement. The royalty for the use of any or all of said inventions was fixed at one cent per

pair of shoes manufactured after the effective date of the license. Paragraph 8 provided that "The Licensee admits the validity of any and all of the letters patent of the United States and Canada under which it is hereby licensed and agrees that it will not infringe or contest the validity, thereof or the title of the Licensor, during the life of this agreement." Paragraph 9 provided that "This license is a non-exclusive license"; that "unless sooner terminated as herein provided, [it] shall continue until the last expiration of the Letters Patent hereby licensed. Licensee may, however, by thirty (30) days' written notice to Licensor, terminate this license at any time after September 1, Nineteen-Hundred Thirty-nine." By paragraph 10 the licensor waived all claims for infringement accruing prior to September 1, 1937, "provided this license is not terminated by the Licensee prior to September 1, 1942."

In the summer or fall of 1934 the defendant installed a Compo splitting machine of the design and type illustrated in the Card patent.

■ It is apparent when these contracts are considered together that defendant's first contention is without merit. None of them contains any restraints or restrictions upon trade. On the contrary, the contract of August 3, 1937, provided that "The New Company [Sbicca-Del Mac, Inc.] and the Contractors [the owners of the patents] jointly and severally promise that they will grant or cause to be granted, throughout the life of each of said contract patents, licenses to all responsible shoe manufacturers in the United States and Canada requesting the same" on the basis of a royalty of one cent per pair of shoes, and that there should be no discrimination between licensees on account of machinery, brands or advertising used. See Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926.

■ The contention that the pooling arrangement amounted to a use of the patents to secure a monopoly not granted by the Patent Office and contrary to public policy is not supported by the record. There is no evidence to support the finding that "substantially all the patents relating to skeleton insole shoes" were included in the pool. We find no evidence in the record referring to the number or names of all such patents.

■ The defendant relies upon cases holding that a patent monopoly of one invention may not be used to enlarge or extend the monopoly of another or to promote a business not embraced within the patent. United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; B.B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S. Ct. 406, 86 L.Ed. 367; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S. Ct. 618, 84 L.Ed. 852; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Carbice Corp. of America v. American Patents Developments Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819. This rule is not applicable to the present case. The contract and assignment of the patents with a division of royalties constituted a settlement of pending and threatened litigation. Under these circumstances a settlement such as this was lawful, especially since the advantages were open to all manufacturers of shoes on reasonable terms. Standard Oil Co. v. United States, 283 U.S. 163, 171, 51 S.Ct. 421, 75 L.Ed. 926; Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L. Ed. 284, 21 A.L.R. 1093; Virtue v. Creamery Package Mfg. Co., 227 U.S. 8, 33, 33 S.Ct. 202, 57 L.Ed. 393.

Again, it is argued that the essence of the agreement of August 3, 1937, was to refuse to license one patent without a blanket license covering all of them and payment of royalty on all of them, although the originals of three of the reissued patents had been held invalid. The contract, however, is to the contrary. Paragraph 5 provides that Sbicca-Del Mac, Inc., shall grant licenses to all responsible shoe manufacturers in the United States and Canada "of the contract patents *or any of them.*" (Italics supplied.) The license signed and accepted by the defendant recites that it "desires to utilize the inventions covered by [all of] said patents." There is no evidence that the defendant expressed any desire to be granted a license for only one of the patents; and there is no evidence showing whether other manufacturers requested licenses for one or all of the patents included in the pool.

The defense of unclean hands is not supported by the evidence.

The second cause of action is a claim for unpaid royalties under the first license

agreement referred to supra dated May 1, 1933. It is admitted that the royalties were paid by the defendant in accordance with the terms of the license from May 1, 1933, through April 22, 1935, and that no payments were made thereafter. Recovery is sought for royalties accruing from May 1, 1935, until September 1, 1937, when the first license was superseded by the second license dated as of September 1, 1937. The first license provided for the use and payment of royalties "upon every pair of shoes manufactured pursuant to the terms of such license and embodying the invention of any Letters Patent owned by the Sbicca-Method Shoes", grantor of the license. Plaintiff relies upon the four claims of Sbicca original patent No. 1,902,725 from May 1, 1935, until that patent ceased to exist upon the grant of reissue patent No. 20,724, on February 16, 1937, and on claims 1, 2, 3, 4, 9, 10, and 13 of the latter patent from that date until September 1, 1937. The defenses are (1) nonuse, (2) ouster, and (3) waiver.

In considering the second and third causes of action we are not concerned with the technicalities of the patent law as we were in considering the questions of validity and infringement involved in the first cause of action. The liability of the defendant for royalties is to be determined by the terms of the license contracts. Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 586–588, 26 S.Ct. 150, 50 L.Ed. 317; Carbo-Frost, Inc., v. Pure Carbonic, 8 Cir., 103 F.2d 210, 223; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587, 596. The royalty is to be paid under the contracts for the "use of the inventions set forth" in the patents. The state of the prior art is not material. The defendant as licensee is estopped not only to deny the validity of the patents, Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; Limbershaft Sales Corp. v. A. G. Spalding & Bros. , 2 Cir., 111 F.2d 675, 677, but also to deny that Sbicca and Maccarone had invented anything new. Eclipse Bicycle Co. v. Farrow, supra. If when "broadly and generally considered" the defendant used in the manufacture of shoes the "invention", that is, the method described in any one of the claims of the patents relied upon, or a method equivalent to the method described in any of such claims, it is liable for the royalties provided for in the contracts. Saco-Lowell Shops v. Reynolds, supra; St.

Paul Plow Works v. Starling, 140 U.S. 184, 11 S.Ct. 803, 35 L.Ed. 404.

Applying these principles to the undisputed facts there is no merit in the defense of nonuser to the second cause of action. The trial court found as an ultimate fact that "Defendant did not, after the summer of 1934, use any invention disclosed and claimed in any of the patents involved in this [second] count." The summer of 1934 is the time when the defendant began using the Compo splitting machine in producing a complementary insole-outsole combination from a single sole leather blank. In so doing the defendant used the very essence of the method, or the equivalent of the method, described in the claims in issue, that is, it produced the insoles and outsoles used in manufacturing shoes by splitting a sole blank in the form and manner described in the claims. Unless, therefore, one of its other two defenses is meritorious, it is bound by its contract to pay the royalties demanded.

The trial court made no findings of fact nor conclusions of law, as required by Rule 52(a) of the Rules of Civil Procedure, upon the defenses of ouster and waiver. Since the facts relied upon to support these two defenses are in the record and undisputed we shall not remand the case for this reason alone but will in the exercise of our jurisdiction under such circumstances consider and determine them. See Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 316, 60 S.Ct. 577, 84 L. Ed. 774; Helfer v. Corona Products, 8 Cir., 127 F.2d 612; Knapp v. Imperial Oil & Gas Products Co., 4 Cir., 130 F.2d 1, 3; Hurwitz v. Hurwitz, 78 U.S.App.D.C. 66, 136 F.2d 796; Brown v. Quinlan, Inc., 7 Cir., 138 F.2d 228, 229; Bowles v. Russell Packing Co., 7 Cir., 140 F.2d 354.

The defense of ouster is predicated upon the decision of the District Court of New York, supra, holding the original Sbicca patent invalid. Defendant relies upon Drackett Chemical Co. v. Chamberlain Co., 6 Cir., 63 F.2d 853, to establish an eviction. That case is distinguishable, however, from the present case. There the licensee gave notice that it would cease to pay royalties if the patent there involved in litigation should be held invalid; and this fact was relied upon by the court in holding that there was an eviction. No notice was given at any time in the present case. Further, in the license

agreement of May 1, 1933, the parties to this controversy agreed that "In case said Letters Patent be held invalid by final decision of a competent court of last resort, Licensee shall have the option of terminating this license on Ten (10) days' notice", and no such notice was given. The parties were at liberty to enter into a license agreement containing any conditions for terminating the contract upon which they could agree, and such conditions were binding. The clause in the contract is the measure of the defendant's rights. United States v. Harvey Steel Co., 196 U.S. 310, 316, 25 S.Ct. 240, 49 L.Ed. 492. And when the contingency for which they provided in their contract occurred they were bound by the terms upon which they had agreed, and the contract could be terminated in no other way without the mutual consent of both parties.

■ The evidence fails to support the defense of ouster.

Although the defendant continued to pay royalties after the adoption of the Compo machine in 1934 until April 23, 1935, its contention is that such payments were made by mistake; and that at any rate payments were waived by a letter dated April 26, 1935, to the defendant by the Compo Machinery Corporation, licensing agent at that time for Sbicca Method Shoes, Inc., owner of the patent.

The letter relied upon was written after the decision of the District Court, E.D. New York, April 22, 1935, in Sbicca-Method Shoes, v. Wolf & Sons, D.C., 11 F. Supp. 239, holding the original Sbicca patent invalid. The letter nowhere expressly waives payment of royalties. The question is whether the letter must be so construed, or whether the parties so intended or understood it. The letter, after relating the situation, submitted two propositions to the defendant, first, that it continue to pay royalties, or, second, to withhold payments until the validity of the patent should be established; and, continuing, "Will you please let us know which of the courses regarding royalties, suggested above, you prefer to follow?" The defendant did not answer this letter, but continued to manufacture shoes under the license as before.

That the parties did not at any time understand that royalties were waived is shown by their subsequent conduct. When the second license contract was entered into as of September 1, 1937, it was provid-

ed in paragraph 9 that the defendant, licensee, "may, however by thirty (30) days' written notice to Licensor, terminate this license at any time after September 1, 1939." And paragraph 10 provided: "Licensor, for itself and its predecessors, covenants not to sue licensee *during the life of this license * * * under licenses heretofore granted* by said predecessors. Licensor hereby *agrees further to make said covenant perpetual and waive any of such past causes of action, provided this license is not terminated by the licensee prior to September 1, 1942.*" (Italics supplied.)

The second license was terminated by the defendant pursuant to the right reserved in paragraph 9 by notice given September 8, 1939, that is, prior to September 1, 1942. The agreement of the parties in paragraph 10 of the 1937 license expressly negatives the contention that there had been a waiver in 1935 of plaintiffs' claim to the payment of royalties accrued prior to September 1, 1937, under the first license.

■ We find that the evidence does not support the defense of waiver.

In their third cause of action plaintiffs seek to recover all unpaid royalties under the second license agreement referred to supra for the period from the effective date of that license, September 1, 1937, until and including September 1, 1939, as of which date that license was cancelled. It is admitted by the parties that the defendant paid royalties for its operations under the second license for several months; but in view of the trial court's decision there is no finding of any unpaid balance. It is also admitted that this license covered the Sbicca and Maccarone patents in issue. The license provided that the defendant would pay the royalty fixed therein "upon every pair of shoes manufactured by it embodying any of its inventions or improvements, described and claimed in said Letters Patent or any of them." It is conceded further that the defendant has used the same method of making shoes since September 1, 1937, which it has used since it began using the Compo, or Card, leather splitting machine in the summer or fall of 1934.

The defenses are (1) nonuse, (2) a special agreement, and (3) unclean hands. The first of these defenses, nonuse, is the same defense presented and considered above in respect of the second cause of action based upon the first license; and the

third defense is the same as the defense of unclean hands under the first cause of action. The same facts are relied upon in each instance. What has already been said in the discussion of these issues supra is determinative of both of them here in favor of the plaintiffs.

The trial court made no findings of fact nor conclusions of law relating to the defense of a special agreement. Doubtless such a finding was deemed unnecessary in view of the finding of nonuse. Since the evidence upon this issue is not in conflict and the proper inferences to be drawn therefrom only are in dispute, we shall examine the questions presented.

The defendant contends that even though its method of making a sole by splitting a blank is covered by the patents in issue, no royalties are due under the license of September 1, 1937, because plaintiffs violated a certain condition precedent agreed to by defendant and plaintiffs before the license agreement was signed.

Before signing the license agreement defendant's attorney having examined it suggested in a letter addressed to the defendant and dated August 26, 1937, that the license agreement should contain a "sort of favored nation clause", that is, that if a lesser license fee than one cent per pair were exacted from any other manufacturer, defendant should get the same low figure. The contents of this letter having been communicated to the president of the plaintiff Sbicca-Del Mac, Inc., on September 17, 1937, he sent a telegram to the solicitor for the license saying, "You can guarantee Milius that all manufacturers will pay exact same royalties with no exception. * * *"

Sometime prior to August 3, 1938, the Del-Mac Shoe Process Corporation brought suit against the Kleven Shoe Company of Spencer, Massachusetts, in the United States court for the Southern District of New York, and on that day the case was settled by the plaintiff in this case, Sbicca-Del Mac, Inc., successor of the original plaintiff. In connection with this settlement, the details of which do not appear in the record, Sbicca-Del Mac, Inc., released the Kleven Shoe Company "from any liability to pay to said Sbicca-Del Mac, Inc., any royalties for the period beginning September 1st, 1937, under which Sbicca-Del Mac, Inc., granted to Kleven Shoe Company a license to manufacture shoes under certain patents therein stated." It appears from the answer of the plaintiff to an interrogatory of the defendant that the license agreement referred to in this release is similar to the license agreement signed by the defendant as of September 1, 1937, and that the Kleven license was executed on August 3, 1938, as of September 1, 1937.

Another provision of the settlement of the Kleven Shoe Company case was that the Kleven Shoe Company was authorized to deduct $394 from royalties "which shall become due and payable to us [Sbicca-Del Mac, Inc.] on and after March 1, 1939."

The defendant argues that by the settlement of the litigation referred to the plaintiffs gave to the Kleven Shoe Company "free royalties" for the period from September 1, 1937, through February 28, 1939, and by the credit of $394 a royalty of ¾ cents per pair of shoes thereafter, and that if accorded the same treatment the defendant has paid the royalties claimed in this third cause of action in full. The defendant paid royalties for seven months under its second license amounting to $9,966.53.

The plaintiffs contend that this is an affirmative defense and that the burden was upon the defendant to prove that the Kleven Shoe Company during the period involved was using plaintiffs' patented inventions, and there is no such proof. It is true that there is no such proof; but if it be assumed that since the Kleven Shoe Company had a license covering the inventions of the patents for the period involved it used them, the proof still fails to show that the royalties were free. There is no showing what the consideration was for the release. The record does not show what issues, claims or other conditions were involved in the settlement of the pending litigation. The release of royalties and the license to the Kleven Shoe Company were executed on the same day, August 3, 1938, as parts of the same transaction. There is no evidence that in the compromise and settlement of the pending litigation Sbicca-Del Mac, Inc., did not receive some consideration equivalent to the royalties released and the credit granted. When Mr. Delman, president of Sbicca-Del Mac, Inc., was asked on direct by counsel for defendant why he settled the litigation with the Kleven Shoe Company "that way", that is, by release of royalties and a credit of $394, he answered, "I would say we thought it was good business." He was asked no fur-

ther questions. There is no contention that the settlement was fraudulent or irregular in any way.

 Further, there is nothing in the telegram relied upon, expressly or by implication, which can be construed to bar the plaintiff from using the royalties under its license agreement in the settlement of litigation or for any purpose. Mr. Delman testified that the telegram was sent as "An assurance that the royalty would be one cent * * * and there was no other royalty given to any one." And there is no evidence in the record to the contrary.

 We think the evidence is insufficient to warrant a finding that the plaintiff granted to the Kleven Shoe Company "free royalties" under its license to that company, thereby breaching its contract with the defendant.

Our conclusion is that the decree appealed from should be and it is reversed with instructions to grant an injunction and an accounting under the first cause of action for infringement since September 1, 1939, the date when the second license was cancelled; to determine the unpaid balance of royalties under the second and third causes of action; and to enter judgment accordingly.